# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

July 14, 2014

Lyle W. Cayce
Clerk

No. 13-50411

TEXAS DIVISION, SONS OF CONFEDERATE VETERANS,
INCORPORATED, a Texas Corporation; GRANVEL J. BLOCK, Individually;
RAY W. JAMES, Individually,

Plaintiffs–Appellants

v.

VICTOR T. VANDERGRIFF, In His Official Capacity as Chairman of the
Board; CLIFFORD BUTLER, In His Official Capacity as a Member of the
Board; RAYMOND PALACIOS, JR., In His Official Capacity as a Member of
the Board; LAURA RYAN, In Her Official Capacity as a Member of the
Board; VICTOR RODRIGUEZ, In His Official Capacity as a Member of the
Board; MARVIN RUSH, in his official capacity as a Member of the Board;
JOHN WALKER, III, In His Official Capacity as a Member of the Board;
BLAKE INGRAM, In His Official Capacity as a Member of the Board,

Defendants–Appellees

Appeals from the United States District Court
for the Western District of Texas

Before SMITH, PRADO, and ELROD, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

The Texas Division of the Sons of Confederate Veterans and two of its
officers (collectively "Texas SCV") appeal the district court's grant of summary
judgment in favor of Victor T. Vandergriff, Chairman of the Texas Department
of Motor Vehicles Board, and seven other board members (collectively "the
Board"). Texas SCV argues that the Board violated its First Amendment right

No. 13-50411

to free speech when the Board denied Texas SCV's application for a specialty license plate featuring the Confederate battle flag. The district court rejected Texas SCV's arguments and found that the Board had made a reasonable, content-based regulation of private speech. We disagree, and because the Board engaged in impermissible viewpoint discrimination, we reverse.

## I. BACKGROUND

The State of Texas requires that all registered motor vehicles display a license plate. Tex. Transp. Code Ann. § 504.943; 43 Tex. Admin. Code § 217.22. Texas offers a standard-issue license plate, but, for an additional fee, drivers may display a specialty license plate on their vehicles. *See* Tex. Transp. Code Ann. § 504.008. Under Texas law, there are three different ways to create a specialty license plate. First, the legislature can create and specifically authorize a specialty license plate. *See id.* § 504.601–504.663. Second, any individual or organization can create a specialty plate through a third-party vendor. *Id.* § 504.6011(a). The Texas Department of Motor Vehicles Board must approve any plates created through the private vendor. 43 Tex. Admin. Code § 217.40.

The third and final means of creating a specialty license plate is at issue in this case. The Texas Department of Motor Vehicles Board can issue a new specialty plate, either on its own or in response to an application from a nonprofit organization. Tex. Transp. Code Ann. § 504.801(a). When a nonprofit organization proposes a plate, the Board must approve the plate's design and "may refuse to create a new specialty license plate if the design might be offensive to any member of the public." *Id.* § 504.801(c). The proceeds from the sale of these specialty license plates go to either the Texas Department of Motor Vehicles or to a state agency of the nonprofit organization's choosing. *Id.* § 504.801(b), (e).

2

No. 13-50411

Texas SCV, a nonprofit organization that works to preserve the memory and reputation of soldiers who fought for the Confederacy during the Civil War, applied for a specialty license plate through this third process. Texas SCV's proposed plate features the SCV logo, which is a Confederate battle flag framed on all four sides by the words "Sons of Confederate Veterans 1896." A faint Confederate flag also appears in the background of the proposed plate. The word "Texas" is at the top of the plate in bold text, and "Sons of Confederate Veterans" runs in capitalized letters along the bottom of the plate. An outline of the state of Texas appears in the top, right corner of the proposed plate.

Texas SCV submitted its application in August 2009 to the Texas Department of Transportation, which was the agency responsible for administering the specialty license plate program at the time. The Department of Transportation put Texas SCV's proposed plate to a vote of its seven-member panel. During the first vote, three members voted to approve the plate, and two members voted against; two members failed to vote despite repeated efforts to encourage them to cast their vote. Instead of moving the plate to the public comment period, the Department of Transportation chose to hold another vote. During this second vote, one member voted to approve the plate, four voted against, and two members again failed to vote. The Department of Transportation then denied Texas SCV's application.

The Texas Department of Motor Vehicles subsequently assumed responsibility for administering the specialty license plate program, and Texas SCV renewed its application for a specialty license plate with the Board. The Board invited public comment on Texas SCV's proposed plate on its website and set a date for final review of the plate. Eight of the nine members of the Board were present for the final review meeting, and their vote was deadlocked, four in favor and four against the plate. The Board rescheduled the vote, in the hope that all Board members would be able to be present for

No. 13-50411

the vote. Many members of the public attended the Board meeting where the second vote was scheduled to occur. Texas SCV's proposed plate elicited numerous public comments; while some were in favor, the majority were against approving the plate. At its second vote, the Board unanimously voted against issuing Texas SCV's specialty plate. The Board's resolution explaining its decision stated:

> The Board . . . finds it necessary to deny [Texas SCV's] plate design application, specifically the confederate flag portion of the design, because public comments have shown that many members of the general public find the design offensive, and because such comments are reasonable. The Board finds that a significant portion of the public associate the confederate flag with organizations advocating expressions of hate directed toward people or groups that is demeaning to those people or groups.

Texas SCV sued in federal district court under 42 U.S.C. § 1983, asserting violations of its rights under the First and Fourteenth Amendments. Both parties moved for summary judgment, and the district court granted the Board's motion. First, the district court found that the specialty license plates were private, not government, speech. The court then analyzed Texas SCV's claims under the First Amendment and found that (1) the specialty license plate program was a nonpublic forum; (2) the Board's rejection of Texas SCV's plate "was a content-based restriction on speech, rather than a viewpoint-based limitation"; and (3) the content-based regulation was reasonable. Thus, the district court concluded that the Board had not violated Texas SCV's rights under the First Amendment and entered judgment for the Board.[1] Texas SCV timely appealed.

---

[1] The district court did not reach Texas SCV's claim that the Board had violated its rights under the Fourteenth Amendment, and Texas SCV does not raise its Fourteenth Amendment argument on appeal.

4

No. 13-50411

## II. JURISDICTION

Neither party has argued that this Court lacks jurisdiction, but federal courts have a duty to consider their subject matter jurisdiction sua sponte. *See Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012). In *Henderson v. Stalder*, 407 F.3d 351 (5th Cir. 2005), we were asked to decide whether Louisiana's specialty license plate program discriminated against pro-choice views in violation of the First Amendment. *Id.* at 352. Instead of reaching the merits, we held that the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, barred the suit, and we vacated and remanded with instructions for the district court to dismiss the case for lack of jurisdiction. *Id.* at 360. Because this case involves a seemingly similar fact pattern, we first consider whether the TIA bars the instant case.

Under the TIA, "[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. But, the TIA will not deprive federal courts of jurisdiction when "(a) the 'fees' charged by the state are not taxes for purposes of TIA, or if (b) *Hibbs v. Winn*, 542 U.S. 88 . . . (2004) can be read to encompass this suit." *Henderson*, 407 F.3d at 354. *Hibbs* opens the doors to federal court where the TIA might otherwise bar the suit if "(1) a third party (not the taxpayer) files suit, and (2) the suit's success will enrich, not deplete, the government entity's coffers." *Id.* at 359 (citing *Hibbs*, 542 U.S. at 105–09).

We hold that the TIA does not bar this suit because this case falls under the *Hibbs* exception.[2] The first part of *Hibbs* is met because Texas SCV is a

---

[2] In *Henderson*, this Court concluded that the charges Louisiana citizens paid for the state's "Choose Life" specialty license plate were taxes, not fees. 405 F.3d at 356–59. Although there are differences between how the specialty license plate in *Henderson* and the specialty license plate here were created, we do not decide whether the charges for the specialty license plate here are taxes or fees. Because we hold that the *Hibbs* exception to the TIA applies, we have no reason to consider whether the first exception to the TIA applies.

No. 13-50411

third party.  *See Hibbs*, 542 U.S. at 108 ("[The TIA] has been read to restrain state taxpayers from instituting federal actions to contest their liability for state taxes, but not to stop third parties from pursuing constitutional challenges to tax benefits in a federal forum.").  The second part of *Hibbs* is also met because, if Texas SCV succeeds in having its specialty license plate issued, it will actually enrich the state.  *See* Tex. Transp. Code § 504.801(e) (explaining that the fees collected for specialty license plates reimburse the Board for administrative costs and also go to the credit of the state's specialty license plate fund or the Texas Department of Motor Vehicles fund).

Because the TIA does not bar this suit, the district court had jurisdiction pursuant to 28 U.S.C. § 1331.  We have jurisdiction over this appeal of a final decision of a district court under 28 U.S.C. § 1291.

## III. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Elizondo v. Green*, 671 F.3d 506, 509 (5th Cir. 2012).  We apply the same standard as the district court, and summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Elizondo*, 671 F.3d at 509.

## IV. DISCUSSION

This case presents two primary issues on appeal.  First, we must determine whether the speech on specialty license plates is government speech or private speech.  If we conclude that the speech is private speech, we must then ask whether the Board's decision to reject Texas SCV's specialty license plate was a permissible content-based regulation or impermissible viewpoint discrimination.  We address each issue in turn.

6

## A.     Government Speech or Private Speech

As a threshold matter, we must decide if the speech at issue is government speech. "A government entity has the right to speak for itself. . . . [I]t is entitled to say what it wishes, and to select the views that it wants to express." *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 467, 467–68 (2009) (alteration in original) (citations and internal quotation marks omitted). "The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech." *Id.* at 467. Thus, if we conclude that the speech in this case is government speech, the analysis ends because there has been no First Amendment violation—in fact, the First Amendment would not even apply. *See id.* ("If [Pleasant Grove City and its local officials] were engaging in their own expressive conduct, then the Free Speech Clause has no application."). If, however, we determine that the speech in question is private speech, we must then apply traditional First Amendment principles and analyze whether the Board violated Texas SCV's right to free speech.

The parties disagree over the standard we should apply to determine whether Texas SCV's proposed plate is government speech. Texas SCV maintains that Justice Souter's concurrence in *Summum* sets out the best test for determining government speech: whether a reasonable and fully informed observer would understand the expression to be government speech. *See id.* at 487 (Souter, J., concurring). Texas SCV argues that any reasonable observer would view a specialty license plate as the speech of the individual driving the car. The Board also relies on the Supreme Court's opinion in *Summum,* but argues that speech is government speech when it is under the govenrment's "effective control." Because the specialty license plates are state-approved and the state owns the design, the Board urges this is government, not private, speech.

No. 13-50411

The government speech doctrine is "recently minted," s*ee id.* at 481 (Stevens, J., concurring), and neither the Supreme Court nor this Court has articulated a test to identify government speech. To determine whether the specialty license plates are government or private speech, we look to the two opinions where the Supreme Court has most clearly formulated the government speech doctrine, *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550 (2005), and *Summum*. As we explain, when we compare this case to *Johanns* and *Summum* and consider the Supreme Court's method of deciding those two cases, we conclude that the speech here is private speech.

In *Johanns*, the Supreme Court held that a promotional campaign to encourage beef consumption that the government "effectively controlled" was government speech. *Id.* at 560. The government did not pay for the campaign itself; instead, it funded the campaign by charging an assessment on all sales and importation of cattle and on imported beef products. *Id.* at 554. The government, though, had "set out the overarching message and some of its elements" and had "final approval authority over every word used in every promotional campaign." *Id.* at 561. Thus, because the message in the promotional campaign was "from beginning to end the message established by the Federal Government," the campaign was government speech. *Id.* at 560.

*Summum*, however, shows that "the Supreme Court did not espouse a myopic 'control test' in *Johanns*." *ACLU of N.C. v. Tata*, 742 F.3d 563, 570 (4th Cir. 2014). In *Summum*, the Supreme Court held that Pleasant Grove City, Utah ("the City") had not violated the First Amendment free speech rights of Summum, a religious organization, when the City refused to erect a permanent monument that Summum had tried to donate and place in a public park. The Court held there was no First Amendment violation because "the City's decision to accept certain privately donated monuments while rejecting [Summum's] is best viewed as a form of government speech." *Summum*, 555

8

U.S. at 481. The Supreme Court noted that the City "'effectively controlled' the messages sent by the monuments in the Park by exercising 'final approval authority' over their selection." *See Summum*, 555 U.S. at 473 (quoting *Johanns*, 544 U.S. at 560–61)). But, the Court did not base its holding on City's control over the permanent monuments. Instead, its conclusion focused on the nature of both permanent monuments and public parks. The Court explained that governments have historically used monuments, such as statues, triumphal arches, and columns, "to speak to the public." *Id.* at 470. These "[p]ermanent monuments displayed on public property typically represent government speech." *Id.* The Court also recognized that public parks are a traditional public forum. *See, e.g.*, *id.* at 469 ("With the concept of the traditional public forum as a starting point . . . ."). "Public parks are often closely identified in the public mind with the government unit that owns the land." *Id.* at 472. Thus, given the context, there was "little chance that observers [would] fail to appreciate" that the government was the speaker. *Id.* at 471.

Considering the emphasis on context and the public's perception of the speaker's identity in *Summum*, we think the proper inquiry here is "whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige." *Id.* at 487 (Souter, J., concurring); *see also Roach v. Stouffer*, 560 F.3d 860, 867 (8th Cir. 2009) ("Our analysis boils down to one key question: whether, under all the circumstances, a reasonable and fully informed observer would consider the speaker to be the government or a private party."); *Choose Life Ill., Inc. v. White*, 547 F.3d 853, 863 (7th Cir. 2008) (identifying government speech by asking "[u]nder all the circumstances, would a reasonable person consider the speaker to be the government or a private party").

No. 13-50411

Here, the differences between permanent monuments in public parks and specialty license plates on the back of personal vehicles convince us that a reasonable observer would understand that the specialty license plates are private speech. Unlike their treatment of permanent monuments, states have not traditionally used license plates to convey a particular message to the public. Rather, license plates have primarily been a means of identifying vehicles. *See Wooley v. Maynard*, 430 U.S. 705, 716 (1977) (explaining that one of the reasons the state had asserted an interest in including its motto on state license plates was to "facilitate[] the identification of passenger vehicles"); Tex. Transp. Code Ann. §§ 504.001–504.948 (effecting a vehicle registration scheme); *see also id.* § 504.005 (mandating that each license plate have a "unique identifier"). License plates also do not have the permanent character of monuments in public parks. *See Summum*, 555 U.S. at 464, 480 (contrasting permanent monuments with "temporary displays" and "transitory expressive acts"). An individual may choose a new specialty license plate every year simply by paying a fee, *see* Tex. Transp. Code Ann. § 504.008, and an individual registers for a new license plate any time he or she moves to a new state.

Further, while public parks have traditionally been "closely identified in the public mind with the government" and have "play[ed] an important role in defining the identity [of] a city," the same cannot be said for license plates and the backs of cars. *See Summum*, 555 U.S. at 472. In *Wooley*, the Supreme Court held that New Hampshire could not force its citizens (the plaintiffs were Jehovah's Witnesses) to bear the "Live Free or Die" motto on standard issue license plates because it would be a violation of their First Amendment rights. 430 U.S. at 717. The Court never discussed whether the plates were government or private speech. Instead, it presumed that the license plates were private speech, engaged in a First Amendment analysis, and explicitly stated that because a car was "private property," the government could not

force individuals to bear a license plate with New Hampshire's motto. *Id.* at 713. Thus, the "Supreme Court has indicated that license plates, even when owned by the government, implicate private speech interests because of the connection of any message on the plate to the driver or owner of the vehicle." *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Va. Dep't of Motor Vehicles*, 288 F.3d 610, 621 (4th Cir. 2002) (citing *Wooley*, 430 U.S. at 717). And while the plates at issue in *Wooley* were standard-issue plates, here a third party designed and submitted the specialty license plate, making the connection between the plate and the driver or owner of the car even closer. *See Matwyuk v. Johnson*, No. 2:13–CV–284, 2014 WL 2160448, \*13 (W.D. Mich. May 23, 2014) (discussing *Summum* and concluding that "vanity plates are viewed as defining the identity of the driver of the vehicle bearing them . . . . and that [t]herefore, no reasonable government official . . . would have believed that [the vanity plate] constituted government speech").

Moreover, this case does not present the unworkable system that the Supreme Court feared would be created "[i]f government entities must maintain viewpoint neutrality in their selection of donated monuments." *See Summum*, 555 U.S. at 479. The *Summum* Court noted the "well founded" concerns that requiring viewpoint neutrality would force the City to "either 'brace themselves for an influx of clutter' or face the pressure to remove longstanding and cherished monuments." *Id.* at 479. By contrast, here there is no danger of having too many specialty license plates because they do not take up physical space, nor is there a finite amount of space available for specialty plates. Indeed, whereas the park in *Summum* contained fifteen monuments, there are currently over 350 specialty plates in Texas. The Board has given no indication that there is any limit to the number of designs it will accept. Thus, given the differences between permanent monuments in public

11

parks and specialty license plates on the back of cars, *Summum* does not dictate that specialty license plates are government speech.

Our conclusion that specialty license plates are private speech is consistent with the majority of other circuits that have considered the issue. *See Roach*, 560 F.3d at 867 (specialty plates are private speech); *Arizona Life Coal. v. Stanton*, 515 F.3d 956, 968 (9th Cir. 2008) ("Choose Life" plate with logo depicting the faces of two young children was private speech); *White*, 547 F.3d at 863 ("Messages on specialty license plates cannot be characterized as the government's speech"); *Sons of Confederate Veterans*, 288 F.3d at 621 ("SCV's special plates constitute private speech.").[3] Although only *Roach* was decided after *Summum*, the Eighth Circuit did not think that *Summum* mandated that the specialty license plates were government speech. 650 F.3d at 868 n.3. And for the reasons we explained above, we agree.

The Board, though, urges us to follow the Sixth Circuit's decision in *ACLU of Tennessee v. Bredesen*, 441 F.3d 370 (6th Cir. 2006), where the Sixth Circuit held that a specialty license plate was government speech. The Board claims *Bredesen*'s "holding extends to *all* specialty plates approved by state officials" and can serve as a model for this Court. We disagree. The Sixth Circuit's conclusion that specialty license plates are government speech makes it the sole outlier among our sister circuits. And the Sixth Circuit reached that holding based on facts different from those in the instant case: the Tennessee legislature itself had passed an act specifically authorizing, creating, and

---

[3] In *Byrne v. Rutledge*, 623 F.3d 46 (2d Cir. 2010), the Second Circuit treated Vermont vanity plates as private speech. 623 F.3d at 53–54. The state did not argue that the vanity license plates were government speech before the district court, and though the state raised that argument on appeal, the Second Circuit declined to consider the issue. *Byrne*, 623 F.3d at 53 n.7 (explaining that it is "a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal"). Because *Byrne* did not analyze whether the vanity license plates were government or private speech, we do not include it here.

issuing a "Choose Life" specialty license plate. *Bredesen*, 441 F.3d at 372, 376. We think this distinction alone is sufficient to warrant a different outcome here. But even if it were not, we would decline to follow *Bredesen* because the Sixth Circuit's analysis cannot be reconciled with Supreme Court precedent, specifically *Wooley*. *See id.* at 386 (Martin, J., dissenting) (explaining that *Wooley* found the message on the license plate was private, even though the government had "crafted" and "had ultimate control over" the message); *see also White*, 547 F.3d at 863 (characterizing the Sixth Circuit's conclusion in *Bredesen* as "flawed" in part because of the difficulty in squaring the decision with *Wooley*).

As the Supreme Court has acknowledged, "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech." *Summum*, 555 U.S. at 470. But considering the situation here, we are confident that a reasonable observer would know that a specialty license plate is the speech of the individual driving the car. Thus, we hold that specialty license plates are private speech.[4]

---

[4] The dissent asserts that the majority's "analysis presents a false dichotomy" that the speech must be only government or only private speech. But this is not so. Here, the reasonable observer test implicitly recognizes that specialty plates may have elements of both government and private speech. Ultimately, if "a reasonable and fully informed observer would understand the expression to be government speech," then it is just that. As we explain in the opinion, however, a reasonable observer would understand specialty plates to be private speech. In any event, we need not discuss or adopt a hybrid speech doctrine. Neither party has briefed the concept of hybrid speech or asked for the court to adopt such a doctrine. Nor has the Supreme Court addressed a hybrid speech doctrine.

Moreover, only the Fourth Circuit has discussed hybrid speech in evaluating restrictions of specialty license plates. *See Tata*, 742 F.3d at 568–69 & n.4; *Planned Parenthood of S.C., Inc. v. Rose*, 361 F.3d 786, 794, 800, 801 (4th Cir. 2004). In both opinions, the Fourth Circuit considered specialty license plates that the state legislature had specifically authorized. *Tata*, 742 F.3d at 566; *Rose*, 361 F,3d at 788. The Fourth Circuit used a traditional First Amendment analysis to hold, as we do, that a specialty license plate restriction constituted viewpoint discrimination. *See Tata*, 742 F.3d at 575; *Rose*, 361 F.3d at 794 ("My conclusion that the speech is mixed (both government and private) does not end the discussion, however. I must go on to consider whether the State has engaged in viewpoint discrimination and whether it may engage in viewpoint discrimination . . . .").

No. 13-50411

**B. Content-Based Regulation or Viewpoint Discrimination**

Because the specialty plate program is private speech, we must next determine whether the Board's rejection of Texas SCV's proposed plate was a permissible content-based regulation or impermissible viewpoint discrimination. Making this determination can at times be difficult because the distinction between a content-based regulation and viewpoint discrimination "is not a precise one." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 831 (1995).

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Id.* at 828. Thus, the government may not "favor one speaker over another," "discriminat[e] against speech because of its message," or target "particular views taken by speakers on a subject." *Id.* at 828–29 (citations omitted). Viewpoint discrimination is presumptively impermissible for private speech. *See id.* at 830 ("[V]iewpoint discrimination . . . is presumed impermissible when directed against speech otherwise within the forum's limitations." (citation omitted)); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (explaining that, in a nonpublic forum, the state may not regulate speech in "an effort to suppress expression merely because public officials oppose the speaker's view" (citation omitted)). On the other hand, we are also aware that "content discrimination . . . may be permissible if it preserves the purposes of [the] limited forum." *Rosenberger*, 515 U.S. at 830. In distinguishing between these two types of discrimination, the Supreme Court has explained viewpoint discrimination is "an egregious form of content discrimination" that is "a subset or particular instance of the more general phenomenon of content discrimination." *Id.* at 829–31 (citation omitted).

Texas SCV argues that the Board's denial of Texas SCV's proposed plate was viewpoint discrimination, because the Board "endorsed the viewpoint of

those offended by the Confederate battle flag and discriminated against the view [of Texas SCV] that the flag is a symbol honoring the Confederate soldier, history, and Southern heritage." The Board counters that its decision was not viewpoint discrimination because it did nothing to disparage Texas SCV's view of the Confederate flag, nor did it reject the proposed plate merely because the Board opposed Texas SCV's view. The Board argues it made its decision based solely on the "objective inquiry" of how members of the public would react to Texas SCV's license plate.

We agree with Texas SCV and hold that the Board engaged in impermissible viewpoint discrimination and violated Texas SCV's rights under the First Amendment. In explaining its denial of Texas SCV's application, the Board stated it denied the plate, "specifically the confederate flag portion of the design, because public comments have shown that many members of the general public find the design offensive." By rejecting the plate because it was offensive, the Board discriminated against Texas SCV's view that the Confederate flag is a symbol of sacrifice, independence, and Southern heritage. The Board's decision implicitly dismissed that perspective and instead credited the view that the Confederate flag is an inflammatory symbol of hate and oppression. Texas's specialty license plate program features a number of plates that honor veterans, including Korea Veterans, Vietnam Veterans, Woman Veterans, Buffalo Soldiers, Operation Iraqi Freedom, and World War II Veterans. Given Texas's history of approving veterans plates and the reasons the Board offered for rejecting Texas SCV's plate, it appears that the only reason the Board rejected the plate is the viewpoint it represents.

We understand that some members of the public find the Confederate flag offensive. But that fact does not justify the Board's decision; this is exactly what the First Amendment was designed to protect against. *Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 641 (1994) ("Government

action that stifles speech on account of its message . . . pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion."). As the Supreme Court has already recognized, "any suggestion that the Government's interest in suppressing speech becomes more weighty as popular opposition to that speech grows is foreign to the First Amendment." *See United States v. Eichman*, 496 U.S. 310, 318 (1990). "[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *Simon & Schuster Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 108 (1991) (citations and internal quotation marks omitted).

Further, the Board's "might be offensive to any member of the public" standard lacks specific limiting standards, which gives the state "unbridled discretion" that permits viewpoint discrimination. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007). Indeed, the most recent license plate case to be decided by a federal court, *Matwyuk v. Johnson*, held just this. *Matwyuk* involved Michigan's vanity plate program, which did not allow any license plate configurations "that might carry a connotation offensive to good taste and decency." *Matwyuk*, 2014 WL 2160448, at *1. The *Matwyuk* court held that this "offensive" standard "impermissibly permits the . . . State to deny a license plate application based on viewpoint because the statute lacks objective criteria, and thus confers unbounded discretion on the decisionmaker." *Id.* at *10 (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 150–51 (1969) (noting "the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional")).

No. 13-50411

*Matwyuk*'s conclusion is consistent with many other courts that have held that similar standards present a "very real and substantial" danger that the defendant would exclude speech solely because of its viewpoint. *See United Food & Commercial Workers Union, Local 1099* v. *Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 361–62 (6th Cir. 1998) (holding that the defendant's advertising policy prohibiting "controversial" advertisements was unconstitutionally overbroad because its application presented a "very real and substantial" danger that the defendant would exclude a proposed advertisement solely because of its viewpoint); *see McCauley v. Univ. of the V.I.*, 618 F.3d 232, 248–49 (1st Cir. 2010) ("Paragraph R's use of 'offensive' is, 'on its face, sufficiently broad and subjective that [it] could conceivably be applied to cover any speech . . . th[at] offends someone.'" (alterations in original) (quoting *DeJohn v. Temple Univ.*, 537 F.3d 301, 317 (3d Cir. 2008))); *Aubrey v. City of Cincinnati*, 815 F. Supp. 1100, 1104 (S.D. Ohio 1993) (concluding that the Cincinnati Reds' banner policy allowing banners only if they were in "good taste" left "too much discretion in the decision maker without any standards for that decision maker to base his or her determination"); *Montenegro v. N.H. Div. of Motor Vehicles*, No. 2012-624, 2014 WL 1813278, at *5 (N.H. May 7, 2014) ("Because the 'offensive to good taste' standard is not susceptible of objective definition, the restriction grants DMV officials the power to deny a proposed vanity registration plate because it offends particular officials' subjective idea of what is 'good taste.'").

Here, the tortured procedural history that eventually led to the denial of Texas SCV's plate demonstrates that the subjective standard of offensiveness led to viewpoint discrimination. During the Department of Transportation's initial vote, a majority of a quorum voted to *approve* Texas SCV's plate. Instead of moving the plate to the next step in the approval process, the Department of Transportation chose to hold another vote. The record offers no

valid procedural basis for the Department of Transportation's decision to disregard the initial vote approving the plate. Instead, e-mails between committee members reveal that some members wanted a second vote solely because of the controversial nature of Texas SCV's proposed plate; they denied the plate during this second vote. Once the Board took control of the specialty license plate program, Texas SCV reapplied. At the public hearing before the Board voted on the plate, many members of the public who opposed Texas SCV's plate expressed their concerns about the fact that the plate featured the Confederate flag. Following this public hearing, the Board denied the plate. This sequence of events lends support to our conclusion that SCV's proposed plate was rejected because of its "controversial" and "offensive" viewpoint, which is impermissible viewpoint discrimination.

Further, we reject the Board's argument that the denial of Texas SCV's plate is a content-based regulation because it bans all viewpoints of the Confederate flag. First, there is nothing in the Board's decision that suggests it would exclude all points of view on the Confederate flag. The Board rejected Texas SCV's plate because members of the public found the proposed plate offensive without issuing any overarching ban on the use of the Confederate flag on Texas specialty license plates. But even if the Board were correct that its decision merely excluded multiple viewpoints on the meaning of the Confederate flag, that decision would be equally objectionable. As the Supreme Court explained in *Rosenberger*,

> The . . . assertion that no viewpoint discrimination occurs because the Guidelines discriminate against an entire class of viewpoints reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. Our understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas. If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as

18

offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint. The [idea] that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways.

515 U.S. at 831–32. Silencing both the view of Texas SCV and the view of those members of the public who find the flag offensive would similarly skew public debate and offend the First Amendment.

We are not the only circuit to reach this conclusion. In fact, the majority of the other circuits to consider this question have held that the state engaged in viewpoint discrimination when it denied a specialty license plate based on the speaker's message. *See Byrne*, 623 F.3d at 59 (concluding that a Vermont statute barring vanity plate that referred to a religion or deity was viewpoint discrimination); *Roach*, 560 F.3d at 870 (concluding that Missouri's specialty plate program engaged in viewpoint discrimination when it denied a "Choose Life" plate); *Stanton*, 515 F.3d at 972 (holding that the denial of a specialty license plate application on the basis that the government chose not to enter the Choose Life/Pro-Choice debate was viewpoint discriminatory); *Sons of Confederate Veterans*, 288 F.3d at 626 (holding that a statute that prohibited display of the Confederate flag constituted viewpoint discrimination).

The Seventh Circuit's decision to the contrary does not persuade us to reach a different outcome. The Seventh Circuit is the only one of our sister circuits to consider this question and hold that excluding a specialty license plate because of its content did not violate the First Amendment. *White*, 547 F.3d at 867 (holding that excluding the entire subject of abortion from its specialty license plate program was content-based, but viewpoint-neutral, decision). But even the Seventh Circuit suggested it might have reached a different conclusion if faced with the denial of a specialty flag plate because it

featured a Confederate flag. *See id.* at 865 ("The difference between content and viewpoint discrimination was more readily apparent in *Sons of Confederate Veterans* [*v. Virginia Department of Motor Vehicles*] . . . than it is here. Excluding the Confederate flag from a specialty-plate design . . . [was a] fairly obvious instance[] of discrimination on account of viewpoint. Virginia was not imposing a 'no flags' rule; it was prohibiting the display of a specific symbol commonly understood to represent a particular viewpoint."). Thus, even considering the reasoning in *White*, we are not convinced to reach the same decision as the Seventh Circuit.

The government may not "selectively . . . shield the public from some kinds of speech on the ground that they are more offensive than others." *See Erzonznik v. City of Jacksonville*, 422 U.S. 209, 209 (1975). That is precisely what the Board did, however, when it rejected Texas SCV's plate. Accordingly, we hold that the Board impermissibly discriminated against Texas SCV's viewpoint when it denied the specialty license plate.

## V. CONCLUSION

For the foregoing reasons, we REVERSE and REMAND for further proceedings not inconsistent with this opinion.

No. 13-50411

JERRY E. SMITH, Circuit Judge, dissenting:

This is a jurisprudentially difficult case that can be conscientiously decided in a number of different ways. The majority has chosen a respectable approach: Applying a "reasonable observer test," it reverses a summary judgment for the state after holding that Texas's specialty license plates are not "government speech." Though I agree with much of the cogent and well-written majority opinion, I do not discern a "reasonable observer test" in the applicable caselaw and am also unable to distinguish *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009). Because I would therefore affirm the summary judgment, I respectfully dissent.

I.

The majority correctly rules that we have jurisdiction to hear this matter, though I would not describe *Hibbs v. Winn*, 542 U.S. 88 (2004), as "open-[ing] the doors to federal court[s] where the [Tax Injunction Act ("TIA")] might otherwise bar the suit" or as an "exception" to the TIA. *Winn* merely draws the contours of the TIA, holding that it does not apply where the plaintiff is *not* seeking to "enjoin, suspend or restrain" the collection of state taxes. That is the situation here, where plaintiff Texas Division, Sons of Confederate Veterans ("SCV") *wants* the state to collect taxes, and in *Winn*, in which the plaintiff *wanted* to compel Arizona to collect taxes, as contrasted with the situation in *Henderson v. Stalder*, 407 F.3d 351 (5th Cir. 2005), in which the plaintiff wanted to *enjoin* Louisiana from collecting assessments on license plates. *Winn* does not provide an "exception" to the TIA's bar; if a plaintiff seeks to "enjoin, suspect or restrain" the collection of taxes, *Winn* would provide him no avenue for relief in federal court.

21

No. 13-50411

Moreover, I concur that the state has engaged in viewpoint discrimination: The reason it refused to allow SCV's license plate was that it objected to the pro-Confederate Flag design. I therefore agree that unless the government-speech doctrine protects the state's decision to refuse to produce the plate, SCV would be entitled to relief. I disagree with the majority, however, that the government-speech doctrine does not encompass Texas's decision as to what messages to accept on its license plates. The "reasonable observer" test is not an accurate reflection of discerned law but, instead, manifests an understandable desire to create a plain, quotable test.

II.

The "reasonable observer test" cannot be discerned from the law, though the majority is in good company, given that some of our sister courts have adopted it. The majority announces the "reasonable observer test" after analyzing *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), and *Summum*, but neither decision can be e1xplained by way of that test, and neither provides it. *Livestock Marketing*, as the majority acknowledges, was resolved by way of an "effective control" test. The Supreme Court was not opaque in its reasoning: The reason that government-speech doctrine encompassed ostensibly private ads for the beef industry was that the ads were "from beginning to end the message established by the Federal Government," despite the major role played by private actors in crafting them. *Livestock Marketing*, 544 U.S. at 560.

*Summum* is of little more help to the majority, which logically must bypass large swaths of that opinion, inflate one portion of it, and ultimately morph Justice Souter's lone concurrence (and his dissent in *Livestock Marketing*) into law. Citing *ipse dixit* from the Fourth Circuit, the majority states

22

that *Summum* "shows that 'the Supreme Court did not espouse a myopic 'control test' in [*Livestock Marketing*]." It is not obvious how the majority or the Fourth Circuit reaches that conclusion. According to the majority, *Summum* "did not base its holding on [the city's] control over the permanent monuments. Instead, its conclusion focused on the nature of both permanent monuments and public parks." From that characterization, the majority inaccurately reimagines *Summum* as a "reasonable observer" case.

*Summum* did discuss the association between public parks and governments, but that was only one portion of an opinion that emphasized "effective control" just as much, if not more:

> [T]he City has 'effectively controlled' the messages sent by the monuments in the Park by exercising 'final approval authority' over their selection. [*Livestock Marketing*], 544 U.S., at 560–561. The City has selected those monuments that it wants to display for the purpose of presenting the image of the City that it wishes to project to all who frequent the Park; it has taken ownership of most of the monuments in the Park, including the Ten Commandments monument that is the focus of respondent's concern; and the City has now expressly set forth the criteria it will use in making future selections.

*Summum*, 555 U.S. at 472–78.

The fairest reading of *Summum* is that the Court emphasized a variety of aspects of the public park and saw all of them to weigh in favor of finding government speech. Depending how we count them, the Court gave about half a dozen reasons why the city was entitled to judgment but without attempting to mint any "test," and it is a demonstrable misreading of *Summum* to pigeonhole it as providing otherwise.

The only Justice who favored of a "reasonable observer" test was Justice Souter, and even he does not seem to believe that that test is the law in the wake of *Summum*. Sitting as a circuit judge after *Summum*, Justice Souter—

rather than believing that *Summum* manifested a coalescence around his twice-proposed test (despite that no Justice joined his concurrence in *Summum*)—described the post-*Summum* government-speech doctrine as "at an *adolescent stage of imprecision.*"  *Griswold v. Discoll*, 616 F.3d 53, 59 n.6 (1st Cir. 2010) (Souter, J.) (emphasis added).

Perhaps more poignantly, the "reasonable observer" test demonstrably contradicts binding caselaw.  In *Livestock Marketing*, the Court—again, applying an "effective control" test—held that television advertisements for the beef industry were government speech.  What would a reasonable observer have seen when watching those ads?  He would have seen the familiar trademark "Beef. It's What's for Dinner."  And he would have seen the message "Funded by America's Beef Producers," the logo for the "Beef Board," and a checkmark with the word "BEEF."  *Livestock Marketing*, 544 U.S. at 554–55.  Nowhere would the ad have given any indication that the federal government had anything to do with this industry advertisement.

If a "reasonable observer" test were the law, then *Livestock Marketing* was incorrectly decided.  That is why Justice Souter, espousing the "reasonable observer" test for the first time, dissented in that case.

As for *Summum*, several, if not all, of the privately donated monuments bore some inscription indicating the donor.  For example, the Ten Commandments monument (the monument that triggered the suit) bore the mark of the Fraternal Order of Eagles and a prominent statement authored by the order that the display was presented by it to the city; the order maintained the monument and took steps to ensure that its inscription remained visible.  If the court were only asking whether a "reasonable observer" would see private speech when looking at the monuments, why would that reasonable observer not have concluded that the Ten Commandments monument was the speech of

the Fraternal Order of the Eagles?[1]

The same goes for *Rust v. Sullivan*, 500 U.S. 173 (1991), which involved restrictions on federal funding for "family-planning services" and which prohibited physicians from receiving grants under a federal program ("Title X") from counseling  patients on abortion "as a method of family planning." Against a First Amendment challenge, the Court upheld Title X as a permissible exercise of the government's policy preferences in favor of life and against abortion, despite that the ostensible speaker is the physician, not the government.

Finally, in *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005), a pre-*Summum* case, we held that the state's selection and use of textbooks in public schools was government speech, notwithstanding that a reasonable observer would *also* attribute the speech to several private actors: the authors, publishers, and editors of the textbooks.  In short, it is not reasonably possible to reconcile the "reasonable observer" test with existing caselaw.

A final comment:  The reasonable observer test would bless the government's behavior in any case involving viewpoint discrimination *so long as it made it clear enough that the government is endorsing the speech that remains in the forum*.  How can it be that the law would provide a test that, by its terms, would allow the government an easy mechanism to shut down speech in any forum on any topic it wants?   Undoubtedly, courts would still routinely condemn viewpoint discrimination, no matter how clearly the government indicates to third-party observers that it is engaging in the censorship.  But

---

[1] The answer is that the reasonable observer may well have attributed the speech to *both* the Fraternal Order *and* the city.  A fundamental error in the majority opinion is describing the government-speech doctrine as presenting a binary choice: government or private speech.  As I explain, every government-speech case that resulted in a victory for the government—including *Summum*—involved private participation in the relevant speech.

No. 13-50411

what that should reveal is that the "reasonable observer test" is not the law.

### III.

The majority properly notes that five courts of appeals have expounded on the applicability of the government-speech doctrine to license plates.[2] The majority understandably emphasizes that all but one have held government-speech doctrine inapplicable.[3] But the landscape is more complicated than that.

None of those circuits meaningfully negotiates *Summum*. That is unsurprising, given that only one of their decisions post-dates *Summum*. And even that opinion was issued less than a month after *Summum*, relegated *Summum* to a footnote, and rejected its relevance summarily.[4] Yet, *Summum* makes the instant question more difficult than such treatment would suggest.

SCV conceded at oral argument that, despite its repeated admonitions that the (near) harmony of our sister courts' judgments should weigh heavily on our own, we are the first court meaningfully to consider the applicability of *Summum* to these facts. I address that now.

---

[2] In this court's only post-*Summum* case dealing (briefly) with government speech, we, in *dictum*, stated that a city's financial support of certain street processions was insufficient to render it "government speech." The key reason was that, though the city gave the parade organizers waivers from having to pay for cleanup, the city did not otherwise have any relationship with the procession's message. *See Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 360 (5th Cir. 2010) (*dictum*; judgment affirmed on other grounds).

[3] *Compare Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'n of Va. Dep't of Motor Vehicles*, 288 F.3d 610 (4th Cir. 2002) (coincidentally involving another division of the SCV); *Arizona Life Coal. Inc. v. Stanton*, 515 F.3d 956 (9th Cir. 2008); *Choose Life Ill., Inc. v. White*, 547 F.3d 853 (7th Cir. 2008); and *Rouch v. Stouffer*, 560 F.3d 860, 867 (8th Cir. 2009) (all holding government speech doctrine inapplicable) *with ACLU of Tenn. v. Bredesen*, 441 F.3d 370 (6th Cir. 2006) (over a dissent, applying government speech doctrine to specialty plates).

[4] *See Rouch* 560 F.3d at 868 n.3.

No. 13-50411

A.

Pleasant Grove City, Utah, has a 2.5-acre public park in its historic district that contained fifteen displays, at least eleven of which were donated by private groups or individuals. The monuments included, among other things, a Nauvoo Temple Stone (an artifact from the Mormon Temple in Nauvoo, Illinois, donated by John Huntsman), a Pioneer Water Well donated by the Lions Club, a Pioneer Granary donated by "the Nelson family," a September 11 monument donated by the Eagle Scouts, and—most relevant to the dispute in *Summum*—a Ten Commandments monument donated by the Fraternal Order of the Eagles in 1971. Several, if not all, of the privately donated monuments bore some inscription indicating the donor. For example, the Ten Commandments monument (which was the monument that, according to the plaintiffs, manifested Pleasant Grove's viewpoint discrimination) bore the mark of the Fraternal Order and a prominent statement authored by the order that the display had been presented by it to the city. The order maintained the monument and took steps to ensure that its inscription remained visible.

Summum, a religious organization, twice wrote to the mayor requesting permission to erect a stone monument containing the "Seven Aphorisms of SUMMUM," similar in size and nature to the Ten Commandments monument; the city rejected the request. Summum sued under 42 U.S.C. § 1983, claiming that the city was engaged in viewpoint discrimination by accepting a Ten Commandments monument but not Summum's religious monument.

The Court held that when the city decided which private monuments it would accept and install in the park, the city was itself speaking, even if it was joining the company of private speakers. Because the city was speaking for itself, the First Amendment were irrelevant, and dissenters could not force the city to accept monuments that it did not wish to have in its park. What is

No. 13-50411

striking about *Summum* is just how much one can analogize almost every salient fact there to the facts here.

## B.

### 1.

First, the Court noted that all parties in *Summum* had agreed that if "a monument . . . is commissioned and financed by a government body for placement on public land," the monument would undoubtedly "constitute[] government speech." *Summum*, 555 U.S. at 470 (describing this statement as an "obvious proposition").[5] The Court then held that the result did not change just because the monuments were privately financed and donated in final form:

> Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land. It certainly is not common for property owners to open up their property for the installation of permanent monuments that convey a message with which they do not wish to be associated.

*Id.* at 471. The same can be said of Texas's specialty license plates, which are made, owned, and sold by the state,[6] which also owns the intellectual property in those plates and does not permit owners to bear plates other than its own.

Just as Pleasant Grove invited or allowed private actors to submit possible monuments for placement in its parks, Texas invites private groups or persons to submit license-plate designs for consideration, but the state ultimately chooses what designs it wishes to adopt and which plates it wishes

---

[5] I take it that SCV would not dispute this proposition, *i.e.*, that this case exists only because Texas has decided not to force drivers to display plates that it designs on its own.

[6] *See* TEX. TRANSP. CODE § 504.002(3) ("[T]he department is the exclusive owner of the design of each license plate.").

No. 13-50411

to manufacture for sale.[7]  Also just as private monuments supplemented those placed by Pleasant Grove in its parks, the privately designed license plates supplement those designed by Texas itself.[8]  The reasoning in *Summum* informs that if Texas license plates would constitute government speech if only Texas had designed the plates itself, they do not lose their governmental character just because Texas accepted a privately designed message, endorsed it, and then placed it on its plates.[9]

2.

Second, the *Summum* Court noted, 555 U.S. at 472, that "[p]ublic parks are often closely identified in the public mind with the government unit that owns the land," a phenomenon that will cause jurisdictions to be selective in which images they choose to represent them:

> [Parks] commonly play an important role in defining the identity that a city projects to its own residents and to the outside world. Accordingly, cities and other jurisdictions take some care in accepting donated monuments. Government decisionmakers select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history, and local culture. The monuments that are accepted, therefore, are meant to convey and have the effect of conveying a government message, and they thus constitute government speech.

*Id.*

---

[7] *See* 43 TEX. ADMIN. CODE § 17.28(i)(8)(B) (providing the DMVB with "final approval authority of all specialty license plate designs"); 43 TEX. ADMIN. CODE § 217.40 (detailing elaborate approval process for private vendor plate designs).

[8] *See* TEX. TRANSP. CODE ANN. § 504.005.

[9] *See also Summum*, 555 U.S. at 471 ("[W]hile government entities regularly accept privately funded or donated monuments, they have exercised selectivity."); *id.* at 473 ("[T]he City has effectively controlled the messages sent by the monuments in the Park by exercising 'final approval authority' over their selection.") (quoting *Livestock Marketing*, 544 U.S. at 560–61).

No. 13-50411

Again, the same can be said of license plates: They are uniformly identified with the state governments that issue them. People see plates when driving on the highways and immediately will recognize and describe them as "Texas license plates." Even specialty plates cannot exist but for the state's cooperation and effort to manufacture and sell them.[10]

Unlike monuments, license plates broadcast an associational image of the state on Texas vehicles wherever they may travel. And unlike monuments, license plates play an integral role in the most usual and rote form of interaction between a citizen and a state's regulatory body: registering one's vehicle. And also unlike monuments, there are no license plates that do not bear the name of the state of registration, directly imputing the state's goodwill and reputation on whatever communication the plate bears.

License plates exist only because of state regulation. They are a method of effecting state vehicle registration regimes, at once *sui generis* and akin to drivers' licenses, passports, currency, green cards, public school or military IDs, or others documents produced by virtue of a state regulatory regime. The association between license plates and a particular government, for that reason alone, could hardly be stronger. [11] It follows that the law allows Texas to choose whether it wishes its name to be associated with any criticism associated with the Confederate flag—whether it wishes the state to be linked to that flag wherever Texas cars are driven.[12]

---

[10] *See generally* TEX. TRANSP. CODE ANN. § 504.945(a).

[11] This analysis calls into question whether the majority is even applying its proffered test correctly. If a reasonable, *informed* observer knows all I have just described of Texas license plates, how could that observer not attribute the message to Texas?

[12] *Cf. Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 331-32 (1st Cir. 2009) (applying *Summum* where a town decided which hyperlinks it would post on its website). The majority's contrary conclusion is largely *ipse dixit*, and I invite the reader to compare the reasons I have given for what would be an obvious association between a state and its license plates with

3.

Third, the *Summum* Court, 555 U.S. at 474, distinguished between the kinds of free speech rights usually occurring on public lands—"the right to speak, distribute leaflets, etc."—and the monuments at issue. The "City ha[d] made no effort to abridge [Summum's] traditional free speech rights," so its followers could continue to go onto the park, speak, distribute literature, and presumably picket and hand out petitions. *Id.* Summum just could not erect fixtures on the park. What Summum really demanded, at bottom, was the city's "adopt[ion]" or "embrace" of its message. *Id.*

The same can be said here. Texas does not prevent SCV from engaging in speech on its or its members' vehicles in the same way that speech has traditionally been made: by license plate frames, bumper stickers, window stickers, window flags, or even painting cars with the Confederate flag. If SCV and its members can do all of those things, why is it seeking an order from a court compelling Texas to sell Confederate plates? The answer is the same answer in *Summum*: SCV seeks the kind of "adopt[ion]" and "embrace" that comes with being on Texas license plates, with appearing next to the state's flag, name, and likeness, and being given the kind of validation that follows from appearing on a state-issued license plate. It is precisely the reason that

the explanation given by the majority. The majority relies, in part, on *Wooley v. Maynard*, 430 U.S. 705, 716 (1977), noting that "one of the reasons the state had asserted an interest in including [the challenged motto in that case]" was to "facilitate[] the identification of passenger vehicles." What the majority does not mention is that the other interest asserted by New Hampshire was to "promote[] appreciation of history, individualism, and state pride." *Id.* So much for the putative novelty of Texas's speaking on its plates. In any event, as I will explain, neither this dissent nor *Summum* is in tension with *Maynard*, which involved a different First Amendment doctrine that addresses concerns different from those pressed by the plaintiffs here.

No. 13-50411

SCV wants to force Texas to produce these plates that it should be denied a court order doing so. Texas, like Pleasant Grove, cannot be forced to associate with messages it does not prefer.

The analogy applies in another important respect. Unlike pamphleteering, speeches, marches, picketing, and bumper stickers—all of which unquestionably involve private speech, even if they occur on government-owned property—erecting monuments and manufacturing specialty license plates both *require* the government's assistance and complicity. That distinction, yet again, makes specialty plates more like park monuments and less like leafleting and bumper stickers.

## C.

Although I have addressed the striking similarities between this case and *Summum*, there are differences: The relationship between the cases is that of an analogy, not an identity. Even in light of every distinction proffered by SCV, the district court, and the majority, there is no principled basis to deviate from *Summum*.

## 1.

The majority opinion presents government-speech doctrine as a binary choice, as deciding whether the plates are "government speech *or* private speech," and stating that "[i]f we conclude that the speech is private speech," we then ask whether the state engaged in viewpoint discrimination. According to the remainder of the majority's reasoning, if a reasonable observer would attribute the message on license plates to the driver, the analysis is over, and

No. 13-50411

the speech is "private" as contradistinguished from "government" speech. That analysis presents a false dichotomy not present in *Summum*. [13]

In *Summum*, the overwhelming majority of the monuments were designed, built, and donated by private actors; and at least some portion (if not all) of the privately donated monuments bore the inscription, name, and/or written message of the donors, including the particular monument that Summum challenged as manifesting viewpoint discrimination. Because of the city's selectivity in deciding which private messages to endorse, the Fraternal Order effectively had a venue that Summum did not. The Court did not hold, however, that such was enough to trigger the protections of the First Amendment.

Indeed, the Court did not seem to find particularly relevant that when the city spoke, it had the company of private speakers. To the contrary, the Court repeatedly disavowed the relevance of the private aspects of the speech that Pleasant Grove was adopting, emphasizing that a "government entity may exercise th[e] same freedom to express its views when it receives assistance from private sources for the purpose of a delivering a government-controlled message" as when it acts alone. [14]

---

[13] *See* Andy G. Olree, *Identifying Government Speech*, 42 CONN. L. REV. 365, 400–10 (2009) (canvassing the growing awareness of the limits of this binary conception); *see also* Caroline Mala Corbin, *Mixed Speech: When Speech Is Both Private and Governmental*, 83 N.Y.U. L. REV. 605 (2008) (proposing to apply intermediate scrutiny to so-called "hybrid" speech cases).

[14] *See Summum*, 555 U.S. at 468 (citing *Livestock Marketing*, 544 U.S. at 562; *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 833 (1995)); *see also id.* at 470–71 ("Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land."); *id.* at 472 ("Although many of the monuments were not designed or built by the City and were donated in completed form by private entities, the City decided to accept those donations and to display them in the Park."); *Livestock Marketing*, 544 U.S. at 562 (stating that where the government controls the message, "it is not precluded from relying on the government-speech doctrine merely because it solicits

No. 13-50411

Because Texas cannot constitutionally force its citizens to carry its message on their cars,[15] there will always be an element of private expression in specialty license plates—no matter their method of distribution or the author of their design—because the driver must have voluntarily chosen to accept a Texas plate. If an affected element of private speech is enough to foreclose application of government-speech doctrine, then the majority's reasoning reduces to this: Texas may not speak on its license plates. It is a false dichotomy to suggest, then, that either Texas is speaking or private citizens are speaking.[16]

The kind of association between Texas and its specialty license reflects the kind of association typical of advertisers and sponsors generally. When we attend a Houston Texans NFL game at its home stadium and see "Ford: the Best in Texas," both the Houston Texans and Ford are speaking. Ford is saying it is the best in Texas; the Texans team is indicating that it is comfortable having its name, reputation, and goodwill associated with Ford and its products. And that association matters; endorsers and sponsors will engage or disengage with one another based on their mutual willingness to be associated with the other.[17]

---

assistance from nongovernmental sources); *Rosenberger*, 515 U.S. at 833 (opining that a government entity may "regulate the content of what is or is not expressed . . . when it enlists private entities to convey its own message").

[15] *See Maynard*, 430 U.S. at 717 (ruling that New Hampshire could not force Quaker to bear license plate with the phrase "Live Free or Die," the state motto).

[16] *See* Joseph Blocher, *Government Property and Government Speech*, 52 WM. & MARY L. REV. 1413, 1479–80 (2011) ("The unavoidable implication is that the expression emanating from specialty license plates is both governmental and private. . . . [A] reasonable observer would probably conclude that both the owner of the vehicle displaying the plate and the state government that authorized it support the plate's message.").

[17] *Cf. Texas v. Knights of the Klu Klux Klan*, 58 F.3d 1075 (5th Cir. 1995) (upholding exclusion of the KKK from Texas's Adopt-a-Highway program, though describing the prohibition as "viewpoint-neutral"). Justice Stevens, who, like Justice Souter and the panel majority,

In the end, *Summum* already tells us how to deal with the mixed quality of affected speech. There, as noted, the private designers and donors of the monuments often kept their own marks and included their own written messages with the monuments accepted by Pleasant Grove. In fact, the very monument that Pleasant Grove challenged as manifesting viewpoint discrimination bore the trademark of a private organization with a plaque containing a message that group had authored. By its facts, then, *Summum* already teaches that government cannot be forced to associate with all viewpoints just because it chooses to associate with one.

The *dictum* in *Summum* describing other monuments suggests the same. The Court, apparently believing them to be obvious examples of government speech, discusses several monuments that have some elements of private speech, such as the Grego-Roman mosaic of the word "Imagine," donated to New York in memory of John Lennon. *See Summum*, 555 U.S. 474–78, for several similar examples. *Summum,* it should be noted, was not remarkable in this regard. Every government speech case in which the government won (few as they are) has involved private participation and sometimes even concerned, as here, private dissemination.[18]

---

would prefer a "reasonable observer test," does not fail to appreciate this. *See Summum*, 555 U.S. at 481 (Stevens, J., concurring) ("While I join the Court's persuasive opinion, I think the reasons justifying the city's refusal would have been equally valid if its acceptance of the monument*, instead of being characterized as 'government speech,' had merely been deemed an implicit endorsement of the donor's message*.") (emphasis added).

[18] *See Livestock Marketing*, 544 U.S. at 555 (finding government-speech doctrine applicable despite that a board of private beef growers managed and produced the relevant promotional campaigns and that the promotional materials were ostensibly associated with said private producers, where the Agriculture Secretary approved all messages before they were disseminated; the advertisement also ran on private newspapers and television stations); *Rust*, 500 U.S. at 192–95 (upholding use of private physicians and hospitals to disseminate government's policy encouraging live birth); *Sutliffe*, 584 F.3d at 329–35 (Town setting up and controlling a town website, choosing which third-party hyperlinks it would allow;

No. 13-50411

Finally, the state can engage in government speech despite the adoption and use of private speech in delivering its message, though no one would question the "mixed" association an observer would have on the message. In *Chiras v. Miller*, 432 F.3d 606 (5th Cir. 2005), a pre-*Summum* case, we held that the state's selection and use of textbooks in public schools constituted government speech, notwithstanding that the textbooks were unquestionably also the speech of their private authors. These cases reveal that the fact that an observer might *also* associate a message with a driver (as well as a private sponsor, such as SCV, for that matter) in addition to the State of Texas does not render the government-speech doctrine inapplicable.

The foregoing analysis also meets SCV's argument that *Maynard*, which held, 430 U.S. at 717, that New Hampshire could not compel drivers to carry "Live Free or Die" license plates, forecloses applying the government-speech doctrine.[19]  *Maynard* was decided before the Supreme Court announced the government-speech doctrine, so that was not at issue. Nevertheless, there is no tension between *Maynard* and the lessons to be drawn from *Summum*. Both compel us to conclude that speech on license plates is "mixed" insofar as it will

---

describing *Summum* as "mak[ing] it clear that when the government uses its discretion to select between the speech of third parties for presentation through communication channels owned by the government and used for government speech, this in itself may constitute an expressive act by the government that is independent of the message of the third-party speech"); *Downs v. L.A. Unified Sch. Dist.*, 228 F.3d 1003, 1011 (9th Cir. 2000) ("While these faculty and staff members may have received materials from outside organizations, the faculty and staff members alone posted material on the bulletin boards, and at all times their postings were subject to the oversight of the school principals."); *Newton v. LePage*, 789 F. Supp. 2d 172, 184 (D. Maine 2011) (private artist commissioned by state to paint a pro-labor mural); *Page v. Lexington Cnty. Sch. Dist. One*, 531 F.3d 275, 282 (4th Cir. 2008) (school board circulating communications by private individuals in support of board's position that particular piece of legislation be voted down).

[19] The panel majority did not rely on *Maynard*, but I address it because it was urged by SCV.

be associated with both the state and the driver. *Maynard* informs us that, under the compelled-speech doctrine, the government may not *force* private speakers to disseminate its message in such a circumstance.[20]   *Summum* informs us that, under the government-speech doctrine, the government will not be forced to associate with all private messages just because it associates with some.

So, if Pleasant View were *ordering* Summum to erect its monument with an inscription indicating its endorsement of the city, *Maynard* would say the city's conduct is unconstitutional.   But where SCV wants to force Texas to produce plates bearing messages with which it does not want to be associated, *Summum* tells us that Texas may permissibly refuse.


2.

The majority attempts to distinguish *Summum* on the ground that "this case does not present the unworkable system that the Supreme Court feared would be created '[i]f government entities must maintain viewpoint neutrality in their selection of donated monuments.'"   For at least two reasons, that second proffered distinction is not a helpful basis for deciding this case.

First, the Court was well aware that content-neutral time, place, and manner restrictions could unquestionably handle every "practical" problem that would manifest itself if park fixtures were considered to create a forum. The Court explicitly rejected the invitation to decide the case accordingly. *See Summum*, 555 U.S. at 479.   Second, no other government-speech case[21] in which the government prevailed presented the kind of "practicality" problem

---

[20] *See also W. Va. State Bd. of Educ. v. Barnette,* 319 U.S. 624 (1943).

[21] The exception is *Newton v. LePage*, 789 F. Supp. 2d 172, 185 (D. Maine 2011), which involved a mural inside a state building's anteroom.

that physical congestion presented in *Summum*. *See, e.g.*, *Livestock Marketing* 544 U.S. at 555 (involving television ads).

Physical congestion, then, is not and cannot be a talisman for finding government speech. Do we have any reason to think that *Summum* would have come out differently if instead of a 2.5-acre park, the city had a 25-acre park? I can think of none. Moreover, *dictum* from the Supreme Court explicitly *assumed* that monuments in NYC's Central Park (which is 778 acres) would qualify as government speech for the same reason as did the park in *Summum*.[22]

For basically the same reason, it is no material distinction that there are 300 types of specialty license plates instead of 15 monuments. Do we have any doubt that Central Park could accommodate 300 privately donated fixtures if the city were inclined to accept them? I presume the argument is not that it would be surprising that the government would ever take positions on 300 topics; that would surely be wrong. At any rate, it would be impossible for us to derive a principle that Texas can speak on its own license plates without opening up a forum, but only if it resolves to associate with no more than X number of positions on Y number of topics.

Perhaps the majority is alluding to a distinction offered by the district court that license plates do not take up "public space." I assume what the court meant here is public real estate.[23] But that could not be relevant. Government messages on currency—the paradigmatic[24] example of government speech—

---

[22] *See Summum*, 555 U.S. at 474–75 (discussing the John Lennon memorial in Central Park).

[23] That is because license plates do take up physical, though noncontiguous, space, and it would presumably be financially impracticable to have an infinite number of license plates.

[24] *See* Carl G. DeNigris, *When Leviathan Speaks: Reining in the Government-Speech*

similarly do not take up public "space." Nor do other more obvious methods of speaking, such as press conferences at the Presidential podium, sense-of-Congress resolutions, or, to take a dramatic example of government speech, the Emancipation Proclamation.

Less dramatically but more relevant, neither *Rust* nor *Livestock Marketing* involved occupation of public real estate. *Livestock Marketing*, for its part, involved television and print ads, the former of which occupies "space" in no sense except the metaphorical. *See Livestock Marketing*, 544 U.S. at 555. And *Rust* involved spoken and written words from physicians and hospitals to patients. *See Rust*, 500 U.S. at 179−80. So, it cannot be the law that the government can speak without opening up a forum and can elicit private assistance in disseminating or even endorsing its message, but only where its actual speech is a fixture on real estate.

The caselaw makes the point well enough, and reason confirms its lesson. The irrelevance of an "occupied public real estate" distinction becomes apparent when we recall what aspect of the specialized license plates triggered the challenge here. No one disputes that if Texas designed its own license plates and compelled drivers to carry only those plates,[25] the government-speech doctrine would apply as clearly as it does to currency or passports. The only reason this case exists is because Texas lets drivers choose plates that were sometimes designed by private actors. Yet, we cannot say that one type of plate takes up "public space" but the other does not.

---

*Doctrine Through a New and Restrictive Approach*, 60 AM. U. L. REV. 133, 135 (2010).

[25] Perhaps with a blank option to satisfy *Maynard*, 430 U.S. at 717 (stating that the state could not force Quaker to bear license plate with the phrase "Live Free or Die," the state motto).

No. 13-50411

3.

The majority, like the district court, also attempts to distinguish *Summum* on the ground that license plates are not "permanent" as are the monuments. At first, this might appear to be a potentially important distinction until one realizes what the Court was explaining in *Summum* with its emphasis on monuments' "permanence" and when one pursues the logical rigor of a rule based on something as relative a concept as "permanence."

Although the *Summum* Court did repeatedly emphasize the permanent nature of the monuments, it had an obvious rhetorical purpose in doing so. Summum was arguing on appeal, with the aid of broad language from Supreme Court precedent, that public parks had been held since "time immemorial" to be a quintessential public forum, where state regulation of speech would be subject to the most exacting scrutiny. Because of that tradition, Pleasant Grove should not have been allowed to engage in what our jurisprudence would consider, along with prior restraints, to be the very worst form of speech restriction: viewpoint discrimination.

The Court responded that the kind of speech that courts had in mind when describing public parks in such lofty terms did not include the installation of fixtures. *See Summum*, 555 U.S. 478–79. Rather, courts were considering things such as pamphleteering, giving speeches, canvassing, leafleting, demonstrations, and the like. So, when the Court emphasized the "permanence" of monuments, it does not appear to have thought that permanence *qua* permanence was significant but instead that that characteristic distinguished the kinds of speech that had already been held to be protected in public parks from the kinds of speech Summum wanted to engage in, which had never been held to be protected in public parks

That is the only understanding of *Summum*'s discussion of "permanence"

No. 13-50411

that accords with reason. We know that permanence cannot be significant in *itself*, because it is a relative concept that does not supply its own meaning, much less its own significance. Monuments, like license plates, can be removed and added over time.[26]    More illustratively, the ads in *Livestock Marketing* were no more "permanent" than was the government speech on Texas's license plates—perhaps less so, because television and radio ads are by their nature fleeting. *See Livestock Marketing*, 544 U.S. at 555. Yet, that did not give the Court any pause in concluding that the ads in *Livestock Marketing* constituted government speech. And again, the quintessential forms of government speech (on currency, passports, and other traditional methods of speaking) do not suggest a kind of "permanence" that reveal the significance of that characteristic.

I do not take SCV to be arguing—as the plaintiffs in *Summum* were—that the putative forum in question is a traditional public forum,[27] like parks, in which the freedom of speech is at its apex. So, unlike the Court in *Summum*, we are not confronted with the difficulty of distinguishing *kinds* of speech in a particular forum and deciding whether all of those kinds of speech are similarly protected by our tradition.

---

[26] *See, e.g.*, *Newton* (applying government-speech doctrine to a governor's removal of a large, wall-sized mural depicting Maine's labor history from lobby of government building; the mural had been in place for three years). Many of the statutory specialty plates in Texas have been around for over ten years. *See, e.g.*, Registration of Vehicles and the Issuance of License Plates by the Texas Department of Transportation; Providing Penalties, 2003 Tex. Sess. Law Serv. ch. 1320 § 6 (H.B. 2971) (Vernon's). Does that connote less "permanence" than does a removable fixture?

[27] The majority curiously attempts to distinguish *Summum* on the ground that license plates—unlike parks—are not traditional public forums. But that surely cuts in the opposite direction. Traditional public forums are where speech restrictions are most strictly scrutinized. The fact that parks had been held since "time immemorial" to be places of public speech was a hurdle for the city in *Summum*. That is, the city won in *Summum despite* the fact that public parks are traditional public forums, not *because* they are public forums.

No. 13-50411

IV.

In sum (pun intended), none of the differences between this case and *Summum* are differences in principle, and none offers a defensible justification for why Pleasant Grove City was entitled to a judgment in its favor in *Summum* but Texas is not so entitled here. The attempt to distinguish *Summum* ultimately devolves to manifesting a conclusion in search of a reason. However insignificant one might find the dispute before us, the law entitles Texas to a judgment in its favor. I respectfully dissent.