United States Court of Appeals
Fifth Circuit

**F I L E D**

**April 13, 2005**

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-30699

_____

RUSSELL J. HENDERSON; ET AL.,

Plaintiffs,

DOREEN KEELER;
PLANNED PARENTHOOD OF LOUISIANA, INC.,

Plaintiffs - Appellees,

versus

RICHARD STALDER, ETC.; ET AL.,

Defendants

RICHARD STALDER, SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND
CORRECTIONS; JOHN KENNEDY, STATE TREASURER,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
New Orleans Division
No. 00-CV-2237-K

_____

Before JOLLY, JONES, and PRADO, Circuit Judges.

EDITH H. JONES, Circuit Judge:

This appeal concerns whether Louisiana's prestige license
plate program facially discriminates against pro-choice views in
contravention of the First Amendment. The program diverts excess
charges over handling and ordinary registration fees for the plates
to organizations endorsed by the legislature. Because of this

feature of the program, we conclude that we lack jurisdiction over the case because of the Tax Injunction Act, 28 U.S.C. § 1341.

## I. BACKGROUND

### A. The First Appeal

This case is on appeal for the second time. The plaintiffs originally filed suit seeking to have LA. REV. STAT. ANN. § 47:461.61, which authorized the adoption of a "Choose Life" prestige license plate, declared unconstitutional. The district court found Louisiana's prestige license plate program created a forum for speech that was not viewpoint neutral, granted both declaratory and injunctive relief, and certified the case for interlocutory appellate review. See Henderson v. Stalder ("Henderson I"), 112 F. Supp. 2d 589 (E.D. La. 2000).

On appeal, this court, sua sponte, concluded that the plaintiffs lacked standing. See Henderson v. Stalder, 287 F.3d 374 (5th Cir. 2002). See also, Women's Emergency Network v. Bush, 323 F.3d 937 (11th Cir. 2003) (rejecting challenge to Florida "Choose Life" plate for lack of standing). The court thus "REVERSED, VACATED, and REMANDED" the case "for an entry of dismissal." Henderson, 287 F.3d at 382. On petition for rehearing, however, the court slightly amended its decision by issuing an order, which reads in part: "The petition for rehearing is DENIED. The case is remanded to the district court with instructions to dismiss the case for lack of standing unless the plaintiff Keeler amends her

2

petition within a reasonable time to challenge the state's overall policy and practice of issuing specialty license plates." Henderson v. Stalder, 57 Fed. Appx. 213, 2003 WL 151183 (5th Cir. Jan. 9, 2003) (unpublished order) (emphasis added). The district court vacated the previous judgment and allowed Keeler to amend her complaint.

**B.    Remand**

The Third Amended Complaint named individuals Henderson, Keeler, Loewy, and LaMothe, and organizations (National Council of Jewish Women and Planned Parenthood of Louisiana) as plaintiffs, and each attempted to establish standing. See Henderson v. Stalder ("Henderson II"), 265 F. Supp. 2d 699, 707 (E.D. La. 2003). Importantly, the Third Amended Complaint "raise[d] a First Amendment facial challenge to the entire overall policy and practice under which Louisiana makes available certain specially designed license plates for the expression of certain views by Louisiana vehicle owners." Id. The Third Amended Complaint also raised new Establishment Clause claims.

The defendants moved to dismiss on several grounds, and the plaintiffs responded with a motion for partial summary judgment contesting the constitutionality of the license plate program.

The district court first determined that the Fifth Circuit's mandate did not prevent each of the plaintiffs from attempting to reassert standing. See id. at 708-09. Nevertheless,

3

the district court dismissed all the plaintiffs, save Keeler and PPL, for lack of standing based on the reasoning the Fifth Circuit provided. See id. at 709-10.[1] As to Keeler, the court concluded that she sufficiently amended her complaint to present a viable facial challenge to the overall program. The district court also concluded that the amendments to Keeler's complaint cured the redressability problems that were fatal to PPL's funding claim. Furthermore, the district court dispatched the defendants' argument that the Tax Injunction Act barred the challenge. See id. at 720 n.12.

On the merits of Keeler's First Amendment claim, the court again accepted Keeler's argument that the license plate program created a "forum" that permitted only some groups to express their chosen viewpoint. Relying on the Fourth Circuit's decision in Sons of Confederate Veterans, Inc. v. Commissioner, Virginia Dept. of Motor Vehicles ("SCV"), 288 F.3d 610 (4th Cir. 2002), reh'g en banc denied, 305 F.3d 241 (4th Cir. 2002), the district court held that Louisiana's prestige license plate program effectuated unconstitutional viewpoint discrimination and enjoined its enforcement.[2] The court refused to stay the enforcement of its ruling. This appeal ensued.

---

[1] Plaintiffs Henderson, Loewy, LaMotte and the NCJW have not appealed the district court's dismissal of their claims.

[2] PPL's funding and Establishment Clause claims were therefore rendered moot. See Henderson II, 265 F. Supp. 2d at 719.

4

## II. STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, applying the same standards as did the district court. Hodges v. Delta Airlines, Inc., 44 F.3d 334, 335 (5th Cir. 1995) (en banc).

## III. DISCUSSION

The defendants raise three principal arguments on appeal: (1) the district court exceeded the scope of its mandate by allowing PPL to amend its claim; (2) the Tax Injunction Act bars the suit in its entirety; and (3) the prestige license plate program does not violate the First Amendment. For reasons that will be obvious, we do not reach the merits of the case.

### A. PPL's Standing

The defendants rightly contend that the district court exceeded the scope of this court's mandate by permitting PPL to seek to file a complaint on remand. "[T]he mandate rule compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court." United States v. Lee, 358 F.3d 315, 321 (5th Cir. 2004) (citing United States v. Bell, 988 F.2d 247, 251 (1st Cir. 1993)).

The district court failed to abide by this rule. "Where, as here, further proceedings in the district court are specified in the mandate of the Court of Appeals, the district court is limited

5

to holding such as are directed." Crowe v. Smith, 261 F.3d 558, 562 (5th Cir. 2001) (citations and quotations omitted). This court's order permitting Keeler to amend her complaint must be read in light of the original decision in which the case was remanded only for "entry of dismissal." Henderson, 287 F.3d at 382. This court narrowly altered that ruling on rehearing to permit Keeler to add a facial challenge to the entire program — a claim that was absent from her original complaint. This narrow amendment to the Henderson ruling was not an invitation for Keeler to add new claims or rationales for PPL's standing. The appellate court might have explored other avenues by which PPL could establish standing, and might have included remand instructions to that end, but we did neither. Judicial economy considerations — the district court's justification for its decision — are insufficient to overcome the appellate court's express ruling. PPL is therefore dismissed from the suit.

**B.   Tax Injunction Act**

The defendants next contend that the Tax Injunction Act ("TIA") bars Keeler's First Amendment challenge to the prestige license plate program. The TIA prohibits a federal court from "enjoining, suspending or restraining the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such state." 28 U.S.C. § 1341. Keeler's goal in this suit, and the remedy ordered

6

by the district court, in fact enjoined the state's collection of revenue for its entire specialty license plate program. Nevertheless, the TIA would not deprive federal courts of jurisdiction if (a) the "fees" charged by the state are not taxes for purposes of TIA, or if (b) Hibbs v. Winn, __ U.S. __, 124 S.Ct. 2276 (2004) can be read to encompass this suit. Although reasonable minds can differ on both questions, we are persuaded that the additional amounts that the state collects for specialty plates – above handling and ordinary vehicle registration fees – are indeed taxes rather than regulatory fees. Further, Hibbs's interpretation of the TIA does not contemplate or authorize a suit whose object is to diminish the flow of state revenues. The TIA deprives the federal courts of jurisdiction over Keeler's claim.

A review of the program's operation will illuminate further discussion. Under Louisiana Law, the Secretary of the Department of Public Safety and Corrections ("Secretary" and "DPS") is charged with the task of issuing license plates for private passenger vehicles. See LA. REV. STAT. ANN. § 47:463(A)(3)(a). This legislation also permits the Secretary to issue "special prestige license plates" if the Legislature so authorizes and certain administrative requirements are satisfied. Id. A few rudimentary administrative requirements apply to all prestige plates.[3]

---

[3]    See, e.g., LA. REV. STAT. ANN. § 47:463(A)(3)(a) ("All prestige plates issued after August 15, 1999 shall include a handling charge of three dollars and fifty cents to offset the administrative costs of the department for the issuance of such plates."); LA. REV. STAT. ANN. § 47:463(A)(3)(b) ("No prestige plate shall

7

Other varying preconditions are included in the specific legislation authorizing the individual prestige license plates. For instance, there are monetary differences. More than half of the specialty plates are distributed in exchange for additional charges above the handling charge, and in many cases, like that of the "Choose Life" plates, the charges so collected are distributed to organizations as determined by the legislature. See Henderson I, 112 F. Supp. 2d at 592 (explaining that proceeds from "Choose Life" plates will be distributed to organizations that counsel women to place their children up for adoption). When such an additional charge is required, however, the amount varies from statute to statute. See, e.g., id. at § 47:463.8 (no fee); § 47:463.14 ($25 fee); § 47:463.20 (same fee as "the regular motor vehicle registration license fee"). Moreover, the extra charge may recur annually or may be a one-time charge. See, e.g., id. at § 47:463.8 (one-time charge); § 47:463.31 (annual charge). Second, the moniker associated with the extra fee also varies. See, e.g., id. at § 47:463.33 ("fee"); § 47:463.31 ("royalty"); § 47:463.57 ("donation"). Finally, the allocation of the proceeds differs from statute to statute. See, e.g., id. at § 47:463.8 (funds deposited in state treasury); § 47:463.43 (funds directed to Louisiana Environmental Education Fund); § 47:463.89 (funds directed to New Orleans Recreation Department).

be established after January 1, 2002, until the department has received a minimum of one thousand applications for such plate.").

8

Other distinctions less critical to this case exist among the statutes authorizing specialty plates. The statutes differ in the measure of editorial and aesthetic discretion afforded to the recipients and the Secretary.[4] Some, but not all, of the statutes require that a minimum number of purchasers apply for the specialty plates prior to their production. See, e.g., id. at § 47:463.13 (no minimum applicant requirement for special plates honoring Congressional Medal of Honor recipients); § 47:463.58 (conditioning the Life Center Full Gospel Baptist Cathedral plate on a minimum of one thousand applicants); § 47:463.61 (conditioning the "Choose Life" plate on a minimum of one hundred applicants). Finally, beyond administrative and monetary distinctions, the statutes mandate different eligibility criteria to obtain specialty plates.[5]

---

[4] Louisiana appears to be deliberate about the measure of creative discretion it delegates to the identified groups and how much it retains. The legislature specifically adopted the "Choose Life" statement, allowing only aesthetic decisions to the Choose Life Council. To well-established organizations, the Legislature entrusts the design of the license plate, subject to compliance with certain statutory standards. See, e.g., LA. REV. STAT. ANN. § 47:463.71 ("The license plate shall be of a color and design selected by the Boy Scouts of America, provided that it is in compliance with R.S. 47:463(A)(3).") In other instances, the state imposes more restrictive instructions. See, e.g., id. at § 47:463.75 ("In addition, the plate shall bear the inscription 'SONS OF CONFEDERATE VETERANS' and the logo of the Sons of Confederate Veterans. The department shall approve any logo, symbol, or design before such plate is produced."). As for plates recognizing diffuse interests, Louisiana retains all content-based discretion. See, e.g., id. at § 47:463.112 ("The secretary shall design the plate [recognizing foster and adoptive parenting].").

[5] In some instances, eligibility is based on membership in a particular association or participation in a seminal event. See, e.g., id. at § 47:463.7 (former prisoners of war of World War I, World War II, the Korean Conflict, and the Vietnamese Conflict); § 47:463.13 (U.S. Reserve Forces); § 47:463.20 (Pearl Harbor survivors); § 47:463.22 (Shriners); § 47:463.32 (Knights of Columbus). Other plates express support for a particular institution or entity and therefore do not require membership in a particular organization. See, e.g., id. at § 47.463.67 ("I Support River Region Cancer Center"); § 47:463.110 ("Support 4-H Youth Development"). Still other plates allow citizens to express their support

9

From Keeler's standpoint, the first basis for sustaining federal jurisdiction is that the additional charges Louisiana citizens incur for specialty plates, above the handling charges and ordinary vehicle registration taxes, are fees, not taxes, hence the program is not covered by the TIA. The district court so held, in part because the state statutes characterize the additional charges for the specialty plates as fees. On the contrary, what is a "tax" for purposes of the TIA is a question of federal law on which a state's legislative label has no bearing. <u>Home Builders Ass'n of Miss. Inc. v. City of Madison, Miss.</u>, 143 F.3d 1006, 1010 n.10 (5th Cir. 1998). While this court has acknowledged that "distinguishing a tax from a fee is often a difficult task," <u>id.</u> at 1011, Judge Wisdom distilled the following "workable distinctions" from the caselaw:

> The classic tax sustains the essential flow of revenue to the government, while the classic fee is linked to some regulatory scheme. The classic tax is imposed by a state or municipal legislature, while the classic fee is imposed by an agency upon those it regulates. The classic tax is designed to provide a benefit for the entire community, while the classic fee is designed to raise money to help defray an agency's regulatory expenses.

<u>Home Builders</u>, <u>id.</u> (omitting internal citations). This court added that a broad construction of "tax" is necessary to honor Congress's goals in promulgating the TIA, including that of preventing

--------

for a certain cause or point of view. <u>See</u>, <u>e.g.</u>, <u>id.</u> at § 47:463.40 ("Think Safe Kids"); § 47:463.60 ("Animal Friendly"); § 463.61 ("Choose Life"); § 47:463.69 ("Don't Litter Louisiana"); § 47:463.95 ("Unlocking Autism").

federally-based delays in the collection of public revenues by state and local governments.  Id. (citing Tramel v. Schrader, 505 F.2d 1310, 1315-16 (5th Cir. 1975).

A few brief examples flesh out the distinction between a TIA-covered tax and regulatory fees.  In Hager v. City of West Peoria, 84 F.3d 865 (7th Cir. 1996), the Seventh Circuit held that graduated fees on the weight of truckloads had been legislated to discourage heavy trucks from using a particular road and thus "were passed to control certain activities, not to raise revenue."  84 F.3d at 871.  This court has, on the other hand, routinely characterized local improvement assessments imposed on a selected class of business as taxes, not fees, in line with the understanding that a "tax" "embraces any extraction of property from a private person by a sovereign for its use."  Tramel, 505 F.2d at 1315.  Home Builders reaffirmed this characterization of an impact fee ordinance, which was passed to enhance the provision of municipal services in a rapidly growing city, deeming it a tax in light of the broad public purpose to be served by the funds collected under it.  143 F.3d at 1011-12.

Acknowledging this tax/fee distinction, Keeler relies on Neinast v. Texas, 217 F.3d 275 (5th Cir. 2000), in which this court found no TIA bar to adjudicating handicapped persons' challenge to a Texas statutory fee for obtaining handicapped parking placards. Revenue obtained from the fee was paid into the state highway fund for the purpose of defraying the cost of the handicapped placards.

11

217 F.3d at 278. The court characterized fees, exempt from the TIA, as charges imposed "(1) by an agency, not the legislature; (2) upon those it regulates, not the community as a whole; and (3) for the purpose of defraying regulatory costs, not simply for general revenue-raising purposes." Id. While the first two criteria tugged in opposite directions, the court held that the fee was tagged "for the benefit of the program itself," i.e., to reimburse the costs of the placards. This fact served to distinguish Home Builders. Further, responding to an argument of the state, the court noted that "the question is not where the money is deposited [in general revenue or segregated accounts], but the purpose of the assessment." Id.

Keeler advances three reasons, allegedly rooted in Neinast, to support her contention that the specialty plate program involves the payment of fees. First, she contends that because the program is administered by the Motor Vehicle Unit of the Department of Public Safety and Corrections, the fees are "charged" by a regulatory agency. Second, the charges are imposed "only upon those that the scheme regulates," rather than upon the community as a whole or even the entire vehicle-owning community. Third, she asserts that the additional specialty plate fees are not simply imposed for revenue-raising purposes but are earmarked for very specific organizations and thus "defray the cost of moneys expended to these special programs, which are not intended for the benefit of the entire community." These arguments are either logically

12

attenuated from the facts or inconsistent with our governing caselaw.

First, the fees for Louisiana specialty plates are directly set by the legislature, even though they are collected by a state agency's motor vehicle unit. Neinast concluded that an analogous feature of the handicapped parking fees suggested a TIA-covered tax.

Second, the fact that specialty plate charges are paid by some, though not all, purchasers, much less all license plate purchasers, is suggestive of Neinast, which held that the charge for handicapped placards represented in this respect a fee rather than a tax. On the other hand, this court has held that special assessments imposed on a limited subgroup of the population, were TIA "taxes" because their revenue was used for community improvements. See Home Builders; Tramel. Thus, this factor, whether the charges are imposed "only upon those that the scheme regulates," is ultimately interrelated with the purpose of the charge assessed against a limited subgroup.

Finally, Keeler's argument that specialty plate fees cannot be taxes because they do not serve the general community welfare, inasmuch as they are earmarked for special recipient organizations, is unpersuasive. The fees in question exceed the ordinary motor vehicle registration fees (which are based on a vehicle's value) and an additional handling charge; they are not tied to vehicle regulation as such. As Neinast noted, the question

13

is not where the money is deposited, but the purpose of the assessment. The Louisiana legislature decreed that the excess charges would be used for a number of purposes, ranging from (but not limited to) park development to university education to adoption support. None of these purposes is "regulatory" as to the specialty plate purchasers. Keeler's view of the public benefit served by these expenditures may differ from that of the Louisiana legislature, but it does not transform the additional charges for specialty plates into fees designated for a "regulatory" purpose.

The district court emphasized two features of the specialty plate program in concluding that the additional charges (above the handling fee and registration tax) are fees rather than taxes. The additional charges, it pointed out, are paid <u>voluntarily</u> by vehicle owners, whereas taxes are normally considered involuntary charges. Further, the charges are not imposed uniformly even among purchasers of specialty plates. The court inferred from the inconsistency of the policy that the legislature was benefitting only a few groups rather than the community at large. Both points merit discussion.

The voluntariness of the vehicle owner's payment constitutes, in our view, at most a superficial distinction for purposes of the TIA. Voluntariness is an overinclusive term in this context: Any party who pays special assessments to the government does so "voluntarily" in order to engage in particular activity, whether that activity is homebuilding, engaging in a regulated

14

industry, or obtaining permission to park in handicapped spots. The same can be said of purchasing a "Choose Life" or "Knights of Columbus" or any other specialty license plate logo. A taxpayer "voluntarily" pays the state's ordinary vehicle registration tax for the privilege of legally owning a car, yet that charge is indisputably a tax. It is thus not the taxpayer's motivation but the government's purpose in exacting the charge (here, the additional amount above the handling cost and ordinary vehicle registration tax) that distinguishes taxes from non-TIA-covered regulatory fees.

The variability of the additional charges among purchasers of specialty plates caused the district court to conclude that in many instances, the state is acting as a "collection agency for private charities." 281 F. Supp. 2d at 874. The court deduced that such variable charges cannot "benefit the entire community" because they "are linked to some regulatory scheme — if not a charitable scheme." Id. While these features of the specialty plate program — the variations in charges and use of the funds collected — set it apart from more traditional funding mechanisms, however, they do not render the charges equivalent to regulatory fees outside the TIA. The additional charges "regulate" nothing; they defray no costs of the program itself, as those costs are embodied in the separate, minimal handling fee. That the charges vary among different specialty plates and are distributed in different ways constitute, in our view, legitimate exercises of

15

legislative line-drawing. Moreover, the distribution of some of the funds to private sources simply indicates the legislature's determination to "outsource" certain activities. A dominant feature of the program, evidenced in over half of the provisions authorizing specialty license plates, is to raise revenue. Given the TIA's broad purpose to prevent federal courts from interfering with challenges to state and local revenue-raising measures, and the correspondingly narrow and focused exception that has been carved out for regulatory fees that defray the costs of a particular regulatory regime, we are unwilling to mischaracterize the Louisiana legislature's appropriations measures as "fees" in order to achieve federal jurisdiction.

To fulfill the purposes of the Tax Injunction Act, and because the specialty plate charges cannot under these facts constitute regulatory fees, we are persuaded that the additional charges for specialty plates must be characterized as taxes.

Even though the specialty plate charges may be considered taxes within the scope of TIA, the federal courts may entertain Keeler's suit if it falls within the Supreme Court's recent discussion of the TIA in Hibbs. There, the Supreme Court confronted an Establishment Clause challenge to an Arizona statute that authorized "income-tax credits for payments to organizations that award educational scholarships and tuition grants to children attending private schools." 124 S.Ct. at 2281. The plaintiffs, who did not avail themselves of the tax credits, sought to enjoin

16

the statute's operation.  Focusing on the status of the plaintiffs and the relief sought, the Court concluded that the TIA applies only where the "state taxpayers seek federal court orders enabling _them_ to avoid paying state taxes."  Id. at 2289 (emphasis added).  Hibbs addressed "the question whether the [TIA] was intended to insulate tax laws from constitutional challenge in lower federal courts even when the suit would have no negative impact on tax collection."  Because the plaintiffs there were attacking a tax credit, and the impact of their suit would overturn the credit, thus restoring money to the state treasury, the Court held Section 1341 was not intended "to stop third parties from pursuing constitutional challenges to tax benefits in a federal forum."  Id. at 2290.  Hibbs opened the federal courthouse doors slightly notwithstanding the limits of the TIA, but it did so only where (1) a third party (not the taxpayer) files suit, and (2) the suit's success will enrich, not deplete, the government entity's coffers. See id. at 2888-90.[6]

Keeler's First Amendment attack on Louisiana's prestige license plate program satisfies only the first part of Hibbs.  Her success, however, flies in the face of Hibbs's second prong: in enjoining the program's operation, Keeler's judgment has placed the federal courts in the position of reducing state tax revenues.

---

[6]     See Harvard Law Review, The Supreme Court, 2003 Term – Leading Cases: Tax Injunction Act, 118 Harv. L. Rev. 486, 489-90 (2004);  Martin A. Schwartz, Challenging The Constitutionality Of State Tax Policies In Federal Court, N.Y.L.J., Oct. 19, 2004, at 3.

17

<u>Hibbs</u> affords no support for Keeler's demand to eliminate the revenues generated by the specialty plate program.

As a footnote to this discussion, we observe our disagreement that the injunction obtained by Keeler is constitutionally appropriate. On the contrary, in other cases in which a plaintiff has objected to her exclusion from a state-sponsored forum, the Supreme Court's remedy has not been to close down the forum and censor the speech of others, but to approve injunctions opening up the forum to the plaintiff.[7] Had Keeler sought such forum-opening relief, and had she succeeded on the merits (a hypothetical exercise on this record), the proper relief would have entailed an increase of state revenues and would not conflict with <u>Hibbs</u> or the TIA. We are bound, however, by Keeler's tactical choice and the district court's actual remedy.

For the foregoing reasons, the Tax Injunction Act applies to Keeler's challenge to the Louisiana specialty plate program, and federal courts have no jurisdiction to entertain it. The judgment

---

[7] <u>See, e.g.</u>, <u>Rosenberger v. Rector and Visitors of Univ. of Virginia</u>, 515 U.S. 819, 115 S. Ct. 2510 (1995) (university student organization brought an injunction action against a university challenging denial of funds); <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 103 S. Ct. 948 (1983) (union and members brought action seeking injunction permitting access to a school board's internal mail system); <u>Widmar v. Vincent</u>, 454 U.S. 263, 102 S. Ct. 269 (1981) (holding that a public university may not prohibit a recognized student group from using school facilities for religious worship services or teaching); <u>Police Dept. of City of Chicago v. Mosley</u>, 408 U.S. 92, 92 S. Ct. 2286 (1972) (striking as discriminatory a city ordinance prohibiting all picketing within one hundred-fifty feet of a school, except peaceful picketing of any school involved in a labor dispute).

18

is accordingly VACATED and the case is REMANDED WITH INSTRUCTIONS TO DISMISS.

**VACATED; REMANDED WITH INSTRUCTIONS TO DISMISS.**