EDWARD C. PRADO, Circuit Judge:
The Texas Division of the Sons of Confederate Veterans and two of its officers (collectively “Texas SCV”) appeal the district court’s grant of summary judgment in favor of Victor T. Vandergriff, Chairman of the Texas Department of Motor Vehicles Board, and seven other board members (collectively “the Board”). Texas SCV argues that the Board violated its First Amendment right to free speech when the Board denied Texas SCV’s application for a specialty license plate featuring the Confederate battle flag. The district court rejected Texas SCV’s arguments and found that the Board had made a reasonable, content-based regulation of private speech. We disagree, and because the Board engaged in impermissible viewpoint discrimination, we reverse.
I. BACKGROUND
The State of Texas requires that all registered motor vehicles display a license plate. Tex. Transp. Code Ann. § 504.943; 43 Tex. Admin. Code § 217.22. Texas offers a standard-issue license plate, but, for an additional fee, drivers may display a specialty license plate on their vehicles. See Tex. Transp. Code Ann. § 504.008. Under Texas law, there are three different ways to create a specialty license plate. First, the legislature can create and specifically authorize a specialty license plate. See id. § 504.601-504.663. Second, any individual or organization can create a specialty plate through a third-party vendor. Id. § 504.6011(a). The Texas Department of Motor Vehicles Board must approve any plates created through the private vendor. 43 Tex. Admin. Code § 217.40.
The third and final means of creating a specialty license plate is at issue in this ease. The Texas Department of Motor Vehicles Board can issue a new specialty plate, either on its own or in response to an application from a nonprofit organization. Tex. Transp. Code Ann. § 504.801(a). When a nonprofit organization proposes a plate, the Board must approve the plate’s design and “may refuse to create a new specialty license plate if the design might be offensive to any member of the public.” Id. § 504.801(c). The proceeds from the sale of these specialty license plates go to either the Texas Department of Motor Vehicles or to a state agency of the nonprofit organization’s choosing. Id. § 504.801(b), (e).
Texas SCV, a nonprofit organization that works to preserve the memory and reputation of soldiers who fought for the Confederacy during the Civil War, applied for a specialty license plate through this third process. Texas SCV’s proposed plate features the SCV logo, which is a Confederate battle flag framed on all four sides by the words “Sons of Confederate Veterans 1896.” A faint Confederate flag also appears in the background of the proposed plate. The word “Texas” is at the *391 top of the plate in bold text, and “Sons of Confederate Veterans” runs in capitalized letters along the bottom of the plate. An outline of the state of Texas appears in the top, right corner of the proposed plate.
Texas SCV submitted its application in August 2009 to the Texas Department of Transportation, which was the agency responsible for administering the specialty license plate program at the time. The Department of Transportation put Texas SCV’s proposed plate to a vote of its seven-member panel. During the first vote, three members voted to approve the plate, and two members voted against; two members failed to vote despite repeated efforts to encourage them to cast their vote. Instead of moving the plate to the public comment period, the Department of Transportation chose to hold another vote. During this second vote, one member voted to approve the plate, four voted against, and two members again failed to vote. The Department of Transportation then denied Texas SCV’s application.
The Texas Department of Motor Vehicles subsequently assumed responsibility for administering the specialty license plate program, and Texas SCV renewed its application for a specialty license plate with the Board. The Board invited public comment on Texas SCV’s proposed plate on its website and set a date for final review of the plate. Eight of the nine members of the Board were present for the final review meeting, and them vote was deadlocked, four in favor and four against the plate. The Board rescheduled the vote, in the hope that all Board members would be able to be present for the vote. Many members of the public attended the Board meeting where the second vote was scheduled to occur. Texas SCV’s proposed plate elicited numerous public comments; while some were in favor, the majority were against approving the plate. At its second vote, the Board unanimously voted against issuing Texas SCV’s specialty plate. The Board’s resolution explaining its decision stated:
The Board ... finds it necessary to deny [Texas SCV’s] plate design application, specifically the confederate flag portion of the design, because public comments have shown that many members of the general public find the design offensive, and because such comments are reasonable. The Board finds that a significant portion of the public associate the confederate flag with organizations advocating expressions of hate directed toward people or groups that is demeaning to those people or groups.
Texas SCV sued in federal district court under 42 U.S.C. § 1983, asserting violations of its rights under the First and Fourteenth Amendments. Both parties moved for summary judgment, and the district court granted the Board’s motion. First, the district court found that the specialty license plates were private, not government, speech. The court then analyzed Texas SCV’s claims under the First Amendment and found that (1) the specialty license plate program was a nonpublic forum; (2) the Board’s rejection of Texas SCV’s plate “was a content-based restriction on speech, rather than a viewpoint-based limitation”; and (3) the content-based regulation was reasonable. Thus, the district court concluded that the Board had not violated Texas SCV’s rights under the First Amendment and entered judgment for the Board.[1] Texas SCV timely appealed.
*392 II. JURISDICTION
Neither party has argued that this Court lacks jurisdiction, but federal courts have a duty to consider their subject matter jurisdiction sua sponte. See Gonzalez v. Thaler, — U.S. -, 132 S.Ct. 641, 648, 181 L.Ed.2d 619 (2012). In Henderson v. Stalder, 407 F.3d 351 (5th Cir.2005), we were asked to decide whether Louisiana’s specialty license plate program discriminated against pro-choice views in violation of the First Amendment. Id. at 352. Instead of reaching the merits, we held that the Tax Injunction Act (“TIA”), 28 U.S.C. § 1341, barred the suit, and we vacated and remanded with instructions for the district court to dismiss the case for lack of jurisdiction. Id. at 360. Because this case involves a seemingly similar fact pattern, we first consider whether the TIA bars the instant case.
Under the TIA, “[t]he district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.” 28 U.S.C. § 1341. But, the TIA will not deprive federal courts of jurisdiction when “(a) the ‘fees’ charged by the state are not taxes for purposes of TIA, or if (b) Hibbs v. Winn, 542 U.S. 88, 124 S.Ct. 2276, 159 L.Ed.2d 172 ... (2004) can be read to encompass this suit.” Henderson, 407 F.3d at 354. Hibbs opens the doors to federal court where the TIA might otherwise bar the suit if “(1) a third party (not the taxpayer) files suit, and (2) the suit’s success will enrich, not deplete, the government entity’s coffers.” Id. at 359 (citing Hibbs, 542 U.S. at 105-09, 124 S.Ct. 2276).
We hold that the TIA does not bar this suit because this case falls under the Hibbs exception.[2] The first part of Hibbs is met because Texas SCV is a third party. See Hibbs, 542 U.S. at 108, 124 S.Ct. 2276 (“[The TIA] has been read to restrain state taxpayers from instituting federal actions to contest their liability for state taxes, but not to stop third parties from pursuing constitutional challenges to tax benefits in a federal forum.”). The second part of Hibbs is also met because, if Texas SCV succeeds in having its specialty license plate issued, it will actually enrich the state. See Tex. Transp. Code § 504.801(e) (explaining that the fees collected for specialty license plates reimburse the Board for administrative costs and also go to the credit of the state’s specialty license plate fund or the Texas Department of Motor Vehicles fund).
Because the TIA does not bar this suit, the district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction over this appeal of a final decision of a district court under 28 U.S.C. § 1291.
III. STANDARD OF REVIEW
We review the district court’s grant of summary judgment de novo. Elizondo v. Green, 671 F.3d 506, 509 (5th Cir.2012). We apply the same standard as the district court, and summary judgment is appropriate when “the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as *393 a matter of law.” Fed.R.Civ.P. 56(a); see also Elizondo, 671 F.3d at 509.
IV. DISCUSSION
This case presents two primary issues on appeal. First, we must determine whether the speech on specialty license plates is government speech or private speech. If we conclude that the speech is private speech, we must then ask whether the Board’s decision to reject Texas SCV’s specialty license plate was a permissible content-based regulation or impermissible viewpoint discrimination. We address each issue in turn.
A. Government Speech or Private Speech
As a threshold matter, we must decide if the speech at issue is government speech. “A government entity has the right to speak for itself.... [I]t is entitled to say what it wishes, and to select the views that it wants to express.” See Pleasant Grove City, Utah v. Summum, 555 U.S. 460, 467-68, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009) (alteration in original) (citations and internal quotation marks omitted). “The Free Speech Clause restricts government regulation of private speech; it does not regulate government speech.” Id. at 467, 129 S.Ct. 1125. Thus, if we conclude that the speech in this case is government speech, the analysis ends because there has been no First Amendment violation — in fact, the First Amendment would not even apply. See id. (“If [Pleasant Grove City and its local officials] were engaging in their own expressive conduct, then the Free Speech Clause has no application.”). If, however, we determine that the speech in question is private speech, we must then apply traditional First Amendment principles and analyze whether the Board violated Texas SCV’s right to free speech.
The parties disagree over the standard we should apply to determine whether Texas SCV’s proposed plate is government speech. Texas SCV maintains that Justice Souter’s concurrence in Summum sets out the best test for determining government speech: whether a reasonable and fully informed observer would understand the expression to be government speech. See id. at 487, 129 S.Ct. 1125 (Souter, J., concurring). Texas SCV argues that any reasonable observer would view a specialty license plate as the speech of the individual driving the car. The Board also relies on the Supreme Court’s opinion in Summum, but argues that speech is government speech when it is under the government’s “effective control.” Because the specialty license plates are state-approved and the state owns the design, the Board urges this is government, not private, speech.
The government speech doctrine is “recently minted,” see id. at 481, 129 S.Ct. 1125 (Stevens, J., concurring), and neither the Supreme Court nor this Court has articulated a test to identify government speech. To determine whether the specialty license plates are government or private speech, we look to the two opinions where the Supreme Court has most clearly formulated the government speech doctrine, Johanns v. Livestock Marketing Ass’n, 544 U.S. 550, 125 S.Ct. 2055, 161 L.Ed.2d 896 (2005), and Summum. As we explain, when we compare this case to Johanns and Summum and consider the Supreme Court’s method of deciding those two cases, we conclude that the speech here is private speech.
In Johanns, the Supreme Court held that a promotional campaign to encourage beef consumption that the government “effectively controlled” was government speech. Id. at 560, 125 S.Ct. 2055. The government did not pay for the campaign itself; instead, it funded the campaign by charging an assessment on all sales and importation of cattle and on imported beef products. Id. at 554, 125 S.Ct. 2055. The *394 government, though, had “set out the overarching message and some of its elements” and had “final approval authority over every word used in every promotional campaign.” Id. at 561, 125 S.Ct. 2055. Thus, because the message in the promotional campaign was “from beginning to end the message established by the Federal Government,” the campaign was government speech. Id. at 560, 125 S.Ct. 2055.
Summum, however, shows that “the Supreme Court did not espouse a myopic ‘control test’ in Johanns.” ACLU of N.C. v. Tata, 742 F.3d 563, 570 (4th Cir.2014). In Summum, the Supreme Court held that Pleasant Grove City, Utah (“the City”) had not violated the First Amendment free speech rights of Summum, a religious organization, when the City refused to erect a permanent monument that Summum had tried to donate and place in a public park. The Court held there was no First Amendment violation because “the City’s decision to accept certain privately donated monuments while rejecting [Summum’s] is best viewed as a form of government speech.” Summum, 555 U.S. at 481, 129 S.Ct. 1125. The Supreme Court noted that the City “ ‘effectively controlled’ the messages sent by the monuments in the Park by exercising ‘final approval authority’ over their selection.” See Summum, 555 U.S. at 473, 129 S.Ct. 1125 (quoting Johanns, 544 U.S. at 560-61, 125 S.Ct. 2055). But, the Court did not base its holding on City’s control over the permanent monuments. Instead, its conclusion focused on the nature of both permanent monuments and public parks. The Court explained that governments have historically used monuments, such as statutes, triumphal arches, and columns, “to speak to the public.” Id. at 470, 129 S.Ct. 1125. These “[permanent monuments displayed on public property typically represent government speech.” Id. The Court also recognized that public parks are a traditional public forum. See, e.g., id, at 469, 129 S.Ct. 1125 (“With the concept of the traditional public forum as a starting point....”). “Public parks are often closely identified in the public mind with the government unit that owns the land.” Id. at 472, 129 S.Ct. 1125. Thus, given the context, there was “little chance that observers [would] fail to appreciate” that the government was the speaker. Id. at 471, 129 S.Ct. 1125.
Considering the emphasis on context and the public’s perception of the speaker’s identity in Summum, we think the proper inquiry here is “whether a reasonable and fully informed observer would understand the expression to be government speech, as distinct from private speech the government chooses to oblige.” Id. at 487, 129 S.Ct. 1125 (Souter, J„ concurring); see also Roach v. Stouffer, 560 F.3d 860, 867 (8th Cir.2009) (“Our analysis boils down to one key question: whether, under all the circumstances, a reasonable and fully informed observer would consider the speaker to be the government or a private party.”); Choose Life Ill., Inc. v. White, 547 F.3d 853, 863 (7th Cir.2008) (identifying government speech by asking “[u]nder all the circumstances, would a reasonable person consider the speaker to be the government or a private party”).
Here, the differences between permanent monuments in public parks and specialty license plates on the back of personal vehicles convince us that a reasonable observer would understand that the specialty license plates are private speech. Unlike their treatment of permanent monuments, states have not traditionally used license plates to convey a particular message to the public. Rather, license plates have primarily been a means of identifying vehicles. See Wooley v. Maynard, 430 U.S. 705, 716, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977) (explaining that one of the reasons the state had asserted an interest in including its motto on state license plates was to “facilitate[ ] the identification of *395 passenger vehicles”); Tex. Transp. Code Ann. §§ 504.001-504.948 (effecting a vehicle registration scheme); see also id. § 504.005 (mandating that each license plate have a “unique identifier”). License plates also do not have the permanent character of monuments in public parks. See Summum, 555 U.S. at 464, 480, 129 S.Ct. 1125 (contrasting permanent monuments with “temporary displays” and “transitory expressive acts”). An individual may choose a new specialty license plate every year simply by paying a fee, see Tex. Transp. Code Ann. § 504.008, and an individual registers for a new license plate any time he or she moves to a new state.
Further, while public parks have traditionally been “closely identified in the public mind with the government” and have “playfed] an important role in defining the identity [of] a city,” the same cannot be said for license plates and the backs of cars. See Summum, 555 U.S. at 472, 129 S.Ct. 1125. In Wooley, the Supreme Court held that New Hampshire could not force its citizens (the plaintiffs were Jehovah’s Witnesses) to bear the “Live Free or Die” motto on standard issue license plates because it would be a violation of their First Amendment rights. 430 U.S. at 717, 97 S.Ct. 1428. The Court never discussed whether the plates were government or private speech. Instead, it presumed that the license plates were private speech, engaged in a First Amendment analysis, and explicitly stated that because a car was “private property,” the government could not force individuals to bear a license plate with New Hampshire’s motto. Id. at 713, 97 S.Ct. 1428. Thus, the “Supreme Court has indicated that license plates, even when owned by the government, implicate private speech interests because of the connection of any message on the plate to the driver or owner of the vehicle.” Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm’r of Va. Dep’t of Motor Vehicles, 288 F.3d 610, 621 (4th Cir.2002) (citing Wooley, 430 U.S. at 717, 97 S.Ct. 1428). And while the plates at issue in Wooley were standard-issue plates, here a third party designed and submitted the specialty license plate, making the connection between the plate and the driver or owner of the car even closer. See Matwyuk v. Johnson, No. 2:13-CV-284, — F.Supp.2d -, -, 2014 WL 2160448, *13 (W.D.Mich. May 23, 2014) (discussing Summum and concluding that “vanity plates are viewed as defining the identity of the driver of the vehicle bearing them.... and that [therefore, no reasonable government official ... would have believed that [the vanity plate] constituted government speech”).
Moreover, this case does not present the unworkable system that the Supreme Court feared would be created “[i]f government entities must maintain viewpoint neutrality in their selection of donated monuments.” See Summum, 555 U.S. at 479, 129 S.Ct. 1125. The Summum Court noted the “well founded” concerns that requiring viewpoint neutrality would force the City to “either ‘brace themselves for an influx of clutter’ or face the pressure to remove longstanding and cherished monuments.” Id. at 479, 129 S.Ct. 1125. By contrast, here there is no danger of having too many specialty license plates because they do not take up physical space, nor is there a finite amount of space available for specialty plates. Indeed, whereas the park in Summum contained fifteen monuments, there are currently over 350 specialty plates in Texas. The Board has given no indication that there is any limit to the number of designs it will accept. Thus, given the differences between permanent monuments in public parks and specialty license plates on the back of cars, Summum does not dictate that specialty license plates are government speech.
Our conclusion that specialty license plates are private speech is consistent with *396 the majority of other circuits that have considered the issue. See Roach, 560 F.3d at 867 (specialty plates are private speech); Arizona Life Coal. v. Stanton, 515 F.3d 956, 968 (9th Cir.2008) (“Choose Life” plate with logo depicting the faces of two young children was private speech); White, 547 F.3d at 863 (“Messages on specialty license plates cannot be characterized as the government’s speech”); Sons of Confederate Veterans, 288 F.3d at 621 (“SCV’s special plates constitute private speech.”).[3] Although only Roach was decided after Summum, the Eighth Circuit did not think that Summum mandated that the specialty license plates were government speech. 650 F.3d at 868 n. 3. And for the reasons we explained above, we agree.
The Board, though, urges us to follow the Sixth Circuit’s decision in ACLU of Tennessee v. Bredesen, 441 F.3d 370 (6th Cir.2006), where the Sixth Circuit held that a specialty license plate was government speech. The Board claims Brede-sen’s “holding extends to all specialty plates approved by state officials” and can serve as a model for this Court. We disagree. The Sixth Circuit’s conclusion that specialty license plates are government speech makes it the sole outlier among our sister circuits. And the Sixth Circuit reached that holding based on facts different from those in the instant case: the Tennessee legislature itself had passed an act specifically authorizing, creating, and issuing a “Choose Life” specialty license plate. Bredesen, 441 F.3d at 372, 376. We think this distinction alone is sufficient to warrant a different outcome here. But even if it were not, we would decline to follow Bredesen because the Sixth Circuit’s analysis cannot be reconciled with Supreme Court precedent, specifically Woo-ley. See id. at 386 (Martin, J., dissenting) (explaining that Wooley found the message on the license plate was private, even though the government had “crafted” and “had ultimate control over” the message); see also White, 547 F.3d at 863 (characterizing the Sixth Circuit’s conclusion in Bre-desen as “flawed” in part because of the difficulty in squaring the decision with Wooley).
As the Supreme Court has acknowledged, “[tjhere may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech.” Summum, 555 U.S. at 470, 129 S.Ct. 1125. But considering the situation here, we are confident that a reasonable observer would know that a specialty license plate is the speech of the individual driving the car. Thus, we hold that specialty license plates are private speech.[4]
*397 B. Content-Based Regulation or Viewpoint Discrimination
Because the specialty plate program is private speech, we must next determine whether the Board’s rejection of Texas SCV’s proposed plate was a permissible content-based regulation or impermissible viewpoint discrimination. Making this determination can at times be difficult because the distinction between a content-based regulation and viewpoint discrimination “is not a precise one.” Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819, 881, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995).
“It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys.” Id. at 828, 115 S.Ct. 2510. Thus, the government may not “favor one speaker over another,” “discriminat[e] against speech because of its message,” or target “particular views taken by speakers on a subject.” Id. at 828-29, 115 S.Ct. 2510 (citations omitted). Viewpoint discrimination is presumptively impermissible for private speech. See id. at 830, 115 S.Ct. 2510 (“[Vjiewpoint discrimination ... is presumed impermissible when directed against speech otherwise within the forum’s limitations.” (citation omitted)); Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (explaining that, in a nonpublic forum, the state may not regulate speech in “an effort to suppress ex-pression merely because public officials oppose the speaker’s view” (citation omitted)). On the other hand, we are also aware that “content discrimination ... may be permissible if it preserves the purposes of [the] limited forum.” Rosenberger, 515 U.S. at 830, 115 S.Ct. 2510. In distinguishing between these two types of discrimination, the Supreme Court has explained viewpoint discrimination is “an egregious form of content discrimination” that is “a subset or particular instance of the more general phenomenon of content discrimination.” Id. at 829-31, 115 S.Ct. 2510 (citation omitted).
Texas SCV argues that the Board’s denial of Texas SCV’s proposed plate was viewpoint discrimination, because the Board “endorsed the viewpoint of those offended by the Confederate battle flag and discriminated against the view [of Texas SCV] that the flag is a symbol honoring the Confederate soldier, history, and Southern heritage.” The Board counters that its decision was not viewpoint discrimination because it did nothing to disparage Texas SCV’s view of the Confederate flag, nor did it reject the proposed plate merely because the Board opposed Texas SCV’s view. The Board argues it made its decision based solely on the “objective inquiry” of how members of the public would react to Texas SCV’s license plate.
We agree with Texas SCV and hold that the Board engaged in impermis *398 sible viewpoint discrimination and violated Texas SCV’s rights under the First Amendment. In explaining its denial of Texas SCV’s application, the Board stated it denied the plate, “specifically the confederate flag portion of the design, because public comments have shown that many members of the general public And the design offensive.” By rejecting the plate because it was offensive, the Board discriminated against Texas SCV’s view that the Confederate flag is a symbol of sacrifice, independence, and Southern heritage. The Board’s decision implicitly dismissed that perspective and instead credited the view that the Confederate flag is an inflammatory symbol of hate and oppression. Texas’s specialty license plate program features a number of plates that honor veterans, including Korea Veterans, Vietnam Veterans, Woman Veterans, Buffalo Soldiers, Operation Iraqi Freedom, and World War II Veterans. Given Texas’s history of approving veterans plates and the reasons the Board offered for rejecting Texas SCV’s plate, it appears that the only reason the Board rejected the plate is the viewpoint it represents.
We understand that some members of the public find the Confederate flag offensive. But that fact does not justify the Board’s decision; this is exactly what the First Amendment was designed to protect against. Turner Broadcasting System, Inc. v. F.C.C., 512 U.S. 622, 641, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (“Government action that stifles speech on account of its message ... pose[s] the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion.”). As the Supreme Court has already recognized, “any suggestion that the Government’s interest in suppressing speech becomes more weighty as popular opposition to that speech grows is foreign to the First Amendment.” See United States v. Eichman, 496 U.S. 310, 318, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990). “[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker’s opinion that gives offense, that consequence is a reason for according it constitutional protection.” Simon & Schuster Inc. v. Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 108, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (citations and internal quotation marks omitted).
Further, the Board’s “might be offensive to any member of the public” standard lacks specific limiting standards, which gives the state “unbridled discretion” that permits viewpoint discrimination. Prime Media, Inc. v. City of Brentwood, 485 F.3d 343, 351 (6th Cir.2007). Indeed, the most recent license plate case to be decided by a federal court, Matwyuk v. Johnson, held just this. Matwyuk involved Michigan’s vanity plate program, which did not allow any license plate configurations “that might carry a connotation offensive to good taste and decency.” Matwyuk, — F.Supp.2d at-, 2014 WL 2160448, at *1. The Matwyuk court held that this “offensive” standard “impermissibly permits the ... State to deny a license plate application based on viewpoint because the statute lacks objective criteria, and thus confers unbounded discretion on the deci-sionmaker.” Id. at -, 2014 WL 2160448 at *10 (citing Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (noting “the many decisions of this Court over the last 30 years, holding that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional”)).
*399 Matwyuk’s conclusion is consistent with many other courts that have held that similar standards present a “very real and substantial” danger that the defendant would exclude speech solely because of its viewpoint. See United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg’l Transit Auth., 163 F.3d 341, 361-62 (6th Cir.1998) (holding that the defendant’s advertising policy prohibiting “controversial” advertisements was unconstitutionally overbroad because its application presented a “very real and substantial” danger that the defendant would exclude a proposed advertisement solely because of its viewpoint); see McCauley v. Univ. of the V.I., 618 F.3d 232, 248-49 (3d Cir.2010) (“Paragraph R’s use of ‘offensive’ is, ‘on its face, sufficiently broad and subjective that [it] could conceivably be applied to cover any speech ... th[at] offends someone.’ ” (alterations in original) (quoting DeJohn v. Temple Univ., 537 F.3d 301, 317 (3d Cir.2008))); Aubrey v. City of Cincinnati, 815 F.Supp. 1100, 1104 (S.D.Ohio 1993) (concluding that the Cincinnati Reds’ banner policy allowing banners only if they were in “good taste” left “too much discretion in the decision maker without any standards for that decision maker to base his or her determination”); Montenegro v. N.H. Div. of Motor Vehicles, No. 2012-624, 93 A.3d 290, 298, 2014 WL 1813278, at *5 (N.H. May 7, 2014) (“Because the ‘offensive to good taste’ standard is not susceptible of objective definition, the restriction grants DMV officials the power to deny a proposed vanity registration plate because it offends particular officials’ subjective idea of what is ‘good taste.’ ”).
Here, the tortured procedural history that eventually led to the denial of Texas SCV’s plate demonstrates that the subjective standard of offensiveness led to viewpoint discrimination. During the Department of Transportation’s initial vote, a majority of a quorum voted to approve Texas SCV’s plate. Instead of moving the plate to the next step in the approval process, the Department of Transportation chose to hold another vote. The record offers no valid procedural basis for the Department of Transportation’s decision to disregard the initial vote approving the plate. Instead, e-mails between committee members reveal that some members wanted a second vote solely because of the controversial nature of Texas SCV’s proposed plate; they denied the plate during this second vote. Once the Board took control of the specialty license plate program, Texas SCV reapplied. At the public hearing before the Board voted on the plate, many members of the public who opposed Texas SCV’s plate expressed their concerns about the fact that the plate featured the Confederate flag. Following this public hearing, the Board denied the plate. This sequence of events lends support to our conclusion that SCV’s proposed plate was rejected because of its “controversial” and “offensive” viewpoint, which is impermissible viewpoint discrimination.
Further, we reject the Board’s argument that the denial of Texas SCV’s plate is a content-based regulation because it bans all viewpoints of the Confederate flag. First, there is nothing in the Board’s decision that suggests it would exclude all points of view on the Confederate flag. The Board rejected Texas SCV’s plate because members of the public found the proposed plate offensive without issuing any overarching ban on the use of the Confederate flag on Texas specialty license plates. But even if the Board were correct that its decision merely excluded multiple viewpoints on the meaning of the Confederate flag, that decision would be equally objectionable. As the Supreme Court explained in Rosenberger,
The ... assertion that no viewpoint discrimination occurs because the Guide *400 lines discriminate against an entire class of viewpoints reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech. Our understanding of the complex and multifaceted nature of public discourse has not embraced such a contrived description of the marketplace of ideas. If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one. It is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint. The [idea] that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways.
515 U.S. at 831-32, 115 S.Ct. 2510. Silencing both the view of Texas SCV and the view of those members of the public who find the flag offensive would similarly skew public debate and offend the First Amendment.
We are not the only circuit to reach this conclusion. In fact, the majority of the other circuits to consider this question have held that the state engaged in viewpoint discrimination when it denied a specialty license plate based on the speaker’s message. See Byrne, 623 F.3d at 59 (concluding that a Vermont statute barring vanity plate that referred to a religion or deity was viewpoint discrimination); Roach, 560 F.3d at 870 (concluding that Missouri’s specialty plate program engaged in viewpoint discrimination when it denied a “Choose Life” plate); Stanton, 515 F.3d at 972 (holding that the denial of a specialty license plate application on the basis that the government chose not to enter the Choose Life/Pro-Choice debate was viewpoint discriminatory); Sons of Confederate Veterans, 288 F.3d at 626 (holding that a statute that prohibited display of the Confederate flag constituted viewpoint discrimination).
The Seventh Circuit’s decision to the contrary does not persuade us to reach a different outcome. The Seventh Circuit is the only one of our sister circuits to consider this question and hold that excluding a specialty license plate because of its content did not violate the First Amendment. White, 547 F.3d at 867 (holding that excluding the entire subject of abortion from its specialty license plate program was content-based, but viewpoint-neutral, decision). But even the Seventh Circuit suggested it might have reached a different conclusion if faced with the denial of a specialty flag plate because it featured a Confederate flag. See id. at 865 (“The difference between content and viewpoint discrimination was more readily apparent in Sons of Confederate Veterans [v. Virginia Department of Motor Vehicles] ... than it is here. Excluding the Confederate flag from a specialty-plate design ... [was a] fairly obvious instance[] of discrimination on account of viewpoint. Virginia was not imposing a ‘no flags’ rule; it was prohibiting the display of a specific symbol commonly understood to represent a particular viewpoint.”). Thus, even considering the reasoning in White, we are not convinced to reach the same decision as the Seventh Circuit.
The government may not “selectively ... shield the public from some kinds of speech on the ground that they are more offensive than others.” See Erznoznik v. City of Jacksonville, 422 U.S. 205, 209, 95 S.Ct. 2268, 45 L.Ed.2d 125 (1975). That is precisely what the Board did, however, when it rejected Texas SCV’s plate. Accordingly, we hold that the Board imper-missibly discriminated against Texas SCV’s viewpoint when it denied the specialty license plate.
*401 V. CONCLUSION
For the foregoing reasons, we REVERSE and REMAND for further proceedings not inconsistent with this opinion.

. The district court did not reach Texas SCV's claim that the Board had violated its rights under the Fourteenth Amendment, and Texas SCV does not raise its Fourteenth Amendment argument on appeal.

. In Henderson, this Court concluded that the charges Louisiana citizens paid for the state’s "Choose Life” specialty license plate were taxes, not fees. 405 F.3d at 356-59. Although there are differences between how the specialty license plate in Henderson and the specialty license plate here were created, we do not decide whether the charges for the specialty license plate here are taxes or fees. Because we hold that the Hibbs exception to the TIA applies, we have no reason to consider whether the first exception to the TIA applies.

. In Byrne v. Rutledge, 623 F.3d 46 (2d Cir.2010), the Second Circuit treated Vermont vanity plates as private speech. 623 F.3d at 53-54. The state did not argue that the vanity license plates were government speech before the district court, and though the state raised that argument on appeal, the Second Circuit declined to consider the issue. Byrne, 623 F.3d at 53 n. 7 (explaining that it is "a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal”). Because Byme did not analyze whether the vanity license plates were government or private speech, we do not include it here.

. The dissent asserts that the majority's "analysis presents a false dichotomy” that the speech must be only government or only private speech. But this is not so. Here, the reasonable observer test implicitly recognizes that specialty plates may have elements of both government and private speech. Ultimately, if "a reasonable and fully informed observer would understand the expression to be government speech,” then it is just that. As we explain in the opinion, however, a reasonable observer would understand specialty plates to be private speech. In any event, we need not discuss or adopt a hybrid speech doctrine. Neither party has briefed the concept of hybrid speech or asked for the *397 court to adopt such a doctrine. Nor has the Supreme Court addressed a hybrid speech doctrine.
Moreover, only the Fourth Circuit has discussed hybrid speech in evaluating restrictions of specialty license plates. See Tata, 742 F.3d at 568-69 & n. 4; Planned Parenthood of S.C., Inc. v. Rose, 361 F.3d 786, 794, 800, 801 (4th Cir.2004). In both opinions, the Fourth Circuit considered specialty license plates that the state legislature had specifically authorized. Tata, 742 F.3d at 566; Rose, 361 F.3d at 788. The Fourth Circuit used a traditional First Amendment analysis to hold, as we do, that a specialty license plate restriction constituted viewpoint discrimination. See Tata, 742 F.3d at 575; Rose, 361 F.3d at 794 ("My conclusion that the speech is mixed (both government and private) does not end the discussion, however. I must go on to consider whether the State has engaged in viewpoint discrimination and whether it may engage in viewpoint discrimination....").